# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA


| | | |
|---|---|---|
| LESLYE HERNANDEZ, | ) | Case No.:  0:20-cv-1806 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ECOLAB INC. and DOES 1-100 inclusive, | ) | **COMPLAINT FOR DAMAGES AND** |
| | ) | **JURY TRIAL DEMAND** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   THE PARTIES.................................................................................................... 3

III.  JURISDICTION AND VENUE ........................................................................ 4

IV.   FACTUAL ALLEGATIONS ............................................................................ 5

    a.    OxyCide™ Daily Disinfectant and OxyCide Dilution Management System......... 5

    b.    Plaintiff's Exposure to OxyCide Cleaning Products ............................... 7

    c.    Prior to Plaintiff's Exposure to OxyCide Cleaning Products ............................... 7

    d.    Defendants' Defective OxyCide Cleaning Products ............................... 8

    e.    Plaintiff's Experience Demonstrates a Dangerous Trend Among Persons Exposed to OxyCide Cleaning Products..................................................... 9

    f.    Investigations into OxyCide Cleaning Products.................................................. 11

    g.    Defendants' Failure to Evaluate and Disclose the Health Risks Associated with OxyCide ..................................................................... 14

    h.    NIOSH Recently Recommended Elimination or Substitution of OxyCide as a Primary Approach to Minimize Exposure Risk..................................... 16

    i.    Plaintiff's Experience Illustrates a Preventable Risk Caused by Defendants' Failure to Implement Safeguards ............................................ 20

    j.    Defendants Misrepresented the Safety of OxyCide Cleaning Products .............. 22

V.    CAUSES OF ACTION ..................................................................................... 23

    COUNT I – STRICT LIABILITY – DESIGN DEFECT ..................................... 23

    COUNT II – STRICT LIABILITY – MANUFACTURING DEFECT .............. 27

    COUNT III – STRICT LIABILITY – FAILURE TO WARN............................ 29

    COUNT IV – NEGLIGENCE .......................................................................... 31

    COUNT V – BREACH OF EXPRESS WARRANTY ....................................... 35

    COUNT VI – BREACH OF IMPLIED WARRANTY ...................................... 37

    COUNT VII – INTENTIONAL MISREPRESENTATION ............................... 38

    COUNT VIII – NEGLIGENT MISPRESENTATION ...................................... 45

    COUNT IX – FRAUDULENT CONCEALMENT............................................ 48

VI.   EQUITABLE TOLLING OF STATUTES OF LIMITATIONS....................... 50

VII.  PRAYER FOR RELIEF ................................................................................... 52

VIII. JURY DEMAND .............................................................................................. 53

i

Plaintiff LESLYE HERNANDEZ ("Plaintiff"), by and through the undersigned counsel, brings this Complaint seeking judgment against Defendants Ecolab Inc.(hereinafter "Ecolab") and Does 1-100 ("Doe Defendants") (collectively, "Defendants") for personal injuries sustained from Defendants' defective and unreasonably dangerous product, OxyCide™ Daily Disinfectant Cleaner ("OxyCide Cleaner") and OxyCide™ Dilution Management System (hereinafter collectively referred to as "OxyCide Cleaning Products" or "OxyCide").  At all relevant times, the OxyCide Cleaning Products were manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and/or sold by Defendants. Plaintiff hereby alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff brings this action against Defendant Ecolab, Inc., a multi-billion-dollar corporation which manufactures products for healthcare and industrial applications. Specifically, Plaintiff brings this action to redress Ecolab's use of dangerous chemicals and compounds in their OxyCide™ Daily Disinfectant Cleaner and OxyCide™ Dilution Management System.

2.    Since early 2013, when Ecolab first distributed its OxyCide Cleaning Products to over 500 hospitals nationwide, hospital workers have consistently and repeatedly reported serious physical injuries associated with the use of Ecolab's OxyCide Cleaning Products.  These included burning eyes, nose, and throat, nasal problems, cough,

headache, dizziness, nausea, nose bleeds, asthma-like symptoms, respiratory irritation, skin burns, rashes and other reactions affecting their pulmonary and respiratory functions.

3.    Testing of chemical compounds in OxyCide Cleaning Products reveal the presence of dangerous chemicals and compounds that are known to cause adverse health effects.  Specifically, these tests revealed the presence of peracetic acid (also known as peroxyacetic acid, referred to hereinafter as "PAA"), a known asthmagen (asthma causing substance) and respiratory sensitizer (causing immune responses and adverse respiratory effects, even at low levels of exposure).

4.    Despite advance notices of complications arising from OxyCide Cleaning Products nationwide, Ecolab refused to take affirmative action to analyze, test, study, and/or recall their products.  Instead, Ecolab is content with endangering countless lives as Ecolab's products continue to be sold.  In addition, despite advance notice of adverse health issues from OxyCide, Defendants continue to distribute OxyCide to hospitals nationwide.

5.    Plaintiff Leslye Hernandez has been severely harmed by Ecolab's toxic and hazardous OxyCide Cleaning Products.  Plaintiff works as a housekeeper at Pomona Valley Hospital in Pomona, California.

6.    Plaintiff seeks injunctive relief, ordering Defendants to stop producing OxyCide and/or to properly and adequately warn of the toxic chemicals in OxyCide Cleaning Products, as well as the significant risks of injury with exposure to the product. Plaintiff seeks that the warning be directed to hospitals, healthcare professionals, employees, and/or the general public at risk of exposure to the OxyCide Cleaning Products.

7.      Plaintiff also seeks compensatory and actual damages for the harm suffered due to the foreseeable exposure to OxyCide Cleaning Products.

8.      Based on information and belief, the OxyCide Cleaning Products have not been recalled, and continue to threaten the health and safety of hospital employees who are exposed to the toxic product.

## II.    THE PARTIES

9.      Plaintiff Leslye Hernandez is an individual who, at all times material hereto, was and is a resident and citizen of California.  Plaintiff is employed as a housekeeper at Pomona Valley Hospital.

10.     Defendant Ecolab, Inc., is a Delaware corporation, with its headquarters and principle place of business located at 370 Wabasha Street N Saint Paul, Minnesota 55102-1323 and at all material times hereto, was and is doing business in the State of Minnesota.  Ecolab researches, designs, tests, inspects, manufactures, develops, produces, assembles, services, installs, distributes, markets, advertises, and/or sells a variety of water, hygiene, cleaning, and energy products globally.  During the relevant time period described herein, Ecolab designed, manufactured, produced, inspected, marketed, advertised, promoted, sold, and/or distributed OxyCide Cleaning Products at issue in this litigation.

11.     Defendants DOES 1-50 are the manufacturers, suppliers, distributors, trademark owners, re-packagers, and/or and joint ventures of defective and toxic chemical products and machines/equipment, including acetic acid and hydrogen peroxide-based products or PAA products to which Plaintiff was exposed which were substantial factors in causing her serious and other consequential injuries.

3

12.    Defendants DOES 51-100 are companies, entities, individuals whose negligent or wrongful conduct was a substantial factor in causing Plaintiff's serious and other consequential injuries.

13.    The true names and capacities of Defendants DOES 1 through 100 are unknown to Plaintiff at this time.  Plaintiff will amend this complaint to state the true names and capacities of said fictitious Defendants when they have been ascertained.  Plaintiff is informed and believes and thereon alleges that Defendants DOES 1 through 100 are in some manner responsible for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

14.    Plaintiff is informed and believes and based thereon alleges that, at all times material hereto, including the fictitiously named Defendants, were acting in an individual, corporate, partnership, associate, parent-subsidiary, successor-predecessor, conspiratorial or other capacity or as the agent, employee, co-conspirator, and/or alter ego of their co-Defendants, and in doing the acts herein alleged, were acting within the course and scope of their authority as such parent, successor, partner, associate, agent, employee, co-conspirator, or alter ego, and with the permission, consent, knowledge, authorization, ratification and direction of their co-Defendants, including all fictitiously named Defendants.

### III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy as to Plaintiff exceeds $75,000.00,

exclusive of interest and costs, and because Defendant Ecolab is a citizen of states other than the state in which Plaintiff is a citizen.

16.     Personal jurisdiction over Defendant is proper in the United States District Court for the District of Minnesota because Ecolab: (a) has its principle place of business in the state of Minnesota; (b) conducted business in the state of Minnesota; (c) specifically transacted and conducted business in the state of Minnesota with respect to OxyCide Cleaning Products; and (d) has substantial and continuing contact with the state of Minnesota, thereby purposely availing themselves to jurisdiction in the state of Minnesota and submitting to the authority of the state of Minnesota.

## IV.    FACTUAL ALLEGATIONS

### a.    OxyCide™ Daily Disinfectant and OxyCide Dilution Management System

17.     In or around 2013, Ecolab began manufacturing and marketing OxyCide™ Daily Disinfectant Cleaner, an EPA-registered non-bleach sporicide and virucide.  The main component in OxyCide Cleaner is PAA, a colorless liquid formed by the reaction of hydrogen peroxide and acetic acid.  PAA is known to be one of the strongest oxidizing agents.  OxyCide Cleaner's active ingredients when sold are PAA, hydrogen peroxide ("HP"), and acetic acid ("AA").  At dilution, the active ingredients are PAA and hydrogen peroxide.

18.     Ecolab advertises OxyCide Cleaner as a "One-stop hospital use disinfectant cleaner and deodorant designed for general cleaning, disinfecting and deodorizing of hard nonporous inanimate surfaces.  OxyCide Daily Disinfectant Cleaner is effective in three

(3) minutes against Clostridium difficile (hereinafter "C. Diff.") spores."[1]  Ecolab claims that C. Diff. infections cost the healthcare industry $1.5 billion in annual expenditures. Using this marketing and advertising, Ecolab has been able to sell and place OxyCide Cleaner in over 500 hospitals nationwide.

19.     Ecolab also manufactures the OxyCide™ Dilution Management System, an automated dispenser designed to dilute the concentrated OxyCide Cleaner with water to its at-use pH level of three (3).  The OxyCide Dilution System provides a safety feature where a locked compartment holds the OxyCide Cleaner concentrate and is attached to a suction line for quick and automated dilution.  The dilution system functions by introducing two liquid lines together in a controlled fashion to meet a specified diluted concentration.  A line supplies concentrated OxyCide Cleaner and another supplies water.  Ecolab advertises that with a single push of a button, safe, effective, and diluted OxyCide Cleaner disinfectant is dispensed for use.  Further, the product safety information states that OxyCide Cleaner does not require personal protective equipment when automatically diluted.

20.     The OxyCide Cleaning Products are catered toward industrial use and are not sold as household cleaning solutions due to their hazardous health effects from direct exposure, including severe burns, allergies, respiratory problems, and dangerous effects to the skin and eyes.  Despite being a dangerous household agent, Ecolab markets their OxyCide Cleaning Products to hospitals nationwide as a safe and effective disinfectant, particularly against C. Diff bacterium, when compared to safer bleach cleaner alternatives.

---

[1] OxyCide Daily Disinfectant Cleaner, ECOLAB, http://www.ecolab.com/offerings/concentrated-disinfectants/OxyCide-daily-disinfectant-cleaner (last visited Apr. 3, 2018).

21.    In Europe, PAA is classified as a flammable liquid, organic peroxide, corrosive to skin, toxic to aquatic environment, and harmful by ingestion, inhalation and skin contact.

 

**b.    Plaintiff's Exposure to OxyCide Cleaning Products**

22.    Plaintiff has been employed as a housekeeper at Pomona Valley Hospital in Pomona, California since October 1, 2019.

23.    Starting from the first time she began cleaning with OxyCide, Plaintiff experienced constant burning of the nose and eyes, throat irritation, and exacerbated asthma symptoms.

24.    Prior to Plaintiff's exposure to OxyCide, she had manageable asthma and no major health diagnosis. However, since the chemical exposure, Plaintiff's asthma became much more severe.

25.    Plaintiff experienced several asthma attacks while working with OxyCide at the hospital.

26.     On one occasion, a nurse saw Plaintiff have an asthma attack and assisted Plaintiff in using her inhaler. Immediately following the incident, the nurse that witnessed the asthma attack reported the incident to Plaintiff's supervisor.

27.     Upon information and belief, other coworkers also complained to management of their negative experiences with OxyCide exposure. However, no action was taken to remove the product.

28.     Plaintiff is currently on medical leave; however, she continues to suffer the negative consequences related to OxyCide.

29.     Plaintiff is concerned that her symptoms will continue to worsen when she goes back to work and uses the chemical product again.

**c.     Prior to Plaintiff's Exposure to OxyCide Cleaning Products**

30.     Prior to her OxyCide exposure, Plaintiff had not experienced constant burning of the nose and eyes, throat irritation, and exacerbated asthma symptoms.

**d.     Defendants' Defective OxyCide Cleaning Products**

31.     Based on information and belief, at all times relevant herein, Plaintiff properly used the Product in accordance with Ecolab's instructions for use and complied with all listed safety instructions.

32.     On information and belief, the OxyCide Cleaner was connected to the OxyCide Dilution System and locked in accordance with all safety precautions and methodologies provided by the Ecolab.

33.    On information and belief, at all times relevant herein, Plaintiff performed her job duties with the OxyCide Cleaner from the OxyCide Dilution System which was dispensed into an appropriate container in accordance with the instructions and warnings provided by the Ecolab.  Plaintiff did not change or modify the automated dilution system and abided by all pertinent safeguards.

34.    However, due to Ecolab's defective OxyCide Cleaning Products, Plaintiff's exposure to the OxyCide toxic chemicals caused constant burning of the nose and eyes, throat irritation, and exacerbated asthma symptoms.

35.    Plaintiff would not have suffered such immediate serious injuries without Defendants' negligence in manufacturing, designing, engineering, developing, producing, assembling, equipping, testing, inspecting, repairing, retrofitting, labeling, warning, advertising, marketing, supplying, distributing, wholesaling, and/or selling the defective OxyCide Cleaning Products and/or OxyCide Dilution System.

36.    Plaintiff also would not have suffered such serious injuries had Ecolab revealed necessary information regarding the hazardous OxyCide Cleaning Products and taken necessary precautions and ceased use of OxyCide Cleaning Products following serious health related complaints.

e.    **Plaintiff's Experience Demonstrates a Dangerous Trend Among Persons Exposed to OxyCide Cleaning Products**

37.    Since OxyCide's introduction at hospitals throughout the United States, there have been numerous reports of employees developing serious health related issues

concerning OxyCide, including difficulty breathing, shortness of breath, nausea, vomiting, burning eyes, burning throat, bronchospasms, and/or vocal cord stridor.

38.    Despite repeated complaints and injuries from using OxyCide Cleaning Products, Defendants continued to market the hazardous products and took no action.

39.    Prior to Plaintiff's incidents, and despite all of the complaints from employees of feeling ill after being exposed to the products, Defendants repeatedly told Plaintiff and other hospital employees that OxyCide Cleaning Products were safe despite knowledge to the contrary.

40.    Plaintiff's was not an isolated experience nor was it unavoidable.  In 2015, over 200 healthcare workers at the University of Pittsburgh Medical Center ("UPMC") filed a complaint with the Division of Occupational Safety and Health Administration ("OSHA") to open an investigation.  The healthcare workers complained of adverse health effects, including headaches, nausea, difficulty breathing, among other side effects resulting from OxyCide Cleaning Products.

41.    On information and belief, in or around February 2016, a registered nurse at the Kaiser facility in Fontana, California suffered a similar, but more severe reaction to OxyCide.  The nurse was about ten (10) feet away from a patient room being cleaned with OxyCide when she began experiencing a burning sensation in her nose and lungs, difficulty breathing, coughing, and had ultimately collapsed from respiratory failure.  The nurse was admitted to the hospital and kept in the intensive care unit for five (5) days.  The nurse was diagnosed with vocal cord dysfunction, bronchospasm, acute respiratory failure, and severe

chemical burns in her throat, which required several surgeries and a tracheostomy. The damage she sustained due to OxyCide exposure is permanent.

42.    On information and belief, ChemDAQ, a company devoted to ensuring occupational safety in diverse markets such as the healthcare industry, researched the effects of PAA and found that continued exposure to PAA can result in liver and kidney problems, pulmonary edemas and circulatory problems that can go undetected for months or years. ChemDAQ and other industry experts note flaws in OSHA's investigation due to its methodology for measuring PAA concentrations. At the time of the investigation, OSHA did not have a standard in place for analyzing PAA. The problem is illuminated when OSHA only examines hydrogen peroxide and acetic acid individually, which are not as harmful as when they are combined to create PAA. In May 2015, ChemDAQ released a comment urging companies to install accurate monitoring systems to detect PAA concentrations.

**f.    Investigations into OxyCide Cleaning Products**

43.    Multiple studies have been undertaken regarding Ecolab's OxyCide Cleaner and PAA-based disinfectants, particularly the long-term health effects from exposure to the product.[2]

---

[2] Emmanuelle Cristofari-Marquand et al., *Asthma Caused by Peracetic Acid-Hydrogen Peroxide Mixture*, 49 J. OCCUP. HEALTH 155 (2007), http://joh.sanei.or.jp/pdf/E49/E49_2_11.pdf.

44.    In spring of 2014, the American Conference of Governmental Industrial Hygienist ("ACGIH") set a Short-Term Exposure Limit (STEL) on PAA at 0.4 parts-per million ("ppm"), confirming its dangers in the workplace.[3]

45.    In 2015, the Association of Occupational and Environmental Clinics ("AOEC") listed PAA and hydrogen peroxide as strong oxidants and their mixture is listed as an asthmagen and respiratory sensitizer.    According to NIOSH, asthmagens are substances that can cause asthma, and respiratory sensitizers are substances that can cause an immune response and adverse respiratory effects, even at low levels of exposure[1].

46.    The AOEC clarified that an

> [I]ndividual may develop asthma due to exposure to a sensitizing agent at very low levels of exposure, and this condition may become permanent and require treatment even after exposure has stopped.  The longer an individual is exposed to an asthmagen, the greater the risk of developing asthma.  The person must be exposed to the chemical/substance that caused the initial reaction.  This is not a list of substances that aggravate an individual's asthma, but a list of substances that *cause* asthma.[4]

47.    In 2015, the National Institute for Occupational Safety and Health (NIOSH) conducted a health hazard investigation after healthcare workers at Magee-Women's Hospital in Pittsburgh, Pennsylvania,  contacted the agency and expressed concerns about the reaction to the new sporicidal disinfectant product called OxyCide used at its facility.[5]

---

[3] Adrea Tritschler, *Disinfectant Designed for Patient Health Could be Making Health Workers Sick*, RIVER CURRENTS (Feb. 2016), http://riverwestcurrents.org/2016/02/disinfectant-designed-for-patient-health-could-be-making-health-workers-sick.html (emphasis added).
[4] Gary Evans, *Healthcare Dilemma: Kill the Bugs But Spare the Workers*, AHC MEDIA (Aug. 1, 2016) https://www.ahcmedia.com/articles/138245-protect-patients-harm-workers-cleaning-agent-raises-concerns.
[5] Brie Hawley et al., *Evaluation of Exposure to a New Cleaning and Disinfection Product and Symptoms in Hospital Employees*, NIOSH (Jan 2017), https://www.cdc.gov/niosh/hhe/reports/pdfs/2015-0053-3269.pdf; Gary Evans, *Healthcare Dilemma: Kill the Bugs But Spare the Workers*, AHC MEDIA (Aug. 1, 2016) https://www.ahcmedia.com/articles/138245-protect-patients-harm-workers-cleaning-agent-raises-concerns.

Employees complained of symptoms that included burning eyes, nose, and throat; runny nose; cough; headache, dizziness; nausea; nose bleeds; asthma exacerbation; skin burns; and rashes. NIOSH found that OxyCide users reported higher prevalence of work-related health outcomes including cough, shortness of breath, asthma-like symptoms, asthma attack, use of asthma medicine, asthma symptoms, use of allergy medicine, nasal problems, and skin problems, with wheeze and watery eyes being significantly higher in OxyCide users than non-users. EVS Staff Workers using OxyCide had reported acute eye and airway symptoms, as well as chronic airway symptoms at low levels of measured exposures. NIOSH reported that shortness of breath was significantly associated with increased exposure to PAA, hydrogen peroxide, and acetic acid. All the active ingredients in concentrated and diluted solutions of OxyCide Cleaner show that increased exposure to PAA, hydrogen peroxide, and acetic acid significantly correlated with increases in work-shift acute nasal and eye irritation and shortness of breath.

48.    On April 12, 2016, NIOSH released an interim report concluding that the "findings support the conclusion that exposure to OxyCide is associated with adverse health effects and indicate the need to minimize employee exposures."[6]

49.    In or around 2017, NIOSH conducted an investigation of OxyCide at the Kaiser Permanente Fontana Medical Center after a serious work-related injury occurred relating to OxyCide and a nursing staff. During its investigation, NIOSH conducted interviews with eleven (11) EVS staff, ten (10) nursing staff, and six (6) ancillary staff. Of

---

[6] Brie Hawley et al., *Evaluation of Exposure to a New Cleaning and Disinfection Product and Symptoms in Hospital Employees*, NIOSH (Jan 2017), https://www.cdc.gov/niosh/hhe/reports/pdfs/2015-0053-3269.pdf.

the eleven (11) EVS staff interviewed five (5) reported burning eyes, and six (6) reported nasal irritation, coughing, sneezing, headache, and burning throat.  Two (2) EVS staff reported previous chemical splashes or skin burns.  Six (6) of ten (10) nursing staff reported headache, eyes burning, throat irritation, coughing, nausea, or shortness of breath.  NIOSH also took measurements of the pH levels of diluted OxyCide and found that the pH varied significantly from 3.1 to 7.5 pH.

g.     **Defendants' Failure to Evaluate and Disclose the Health Risks Associated with OxyCide**

50.    Ecolab's Safety Data Sheet for PAA exposure only provides ACGIH's Short Term Exposure Limit or STEL at 0.4 ppm, which is only calculated as a 15-minute time weighted average.  Ecolab failed to investigate, determine, and disclose the health risks associated with short and long-term PAA exposure, particularly in occupational and industrial settings, where Ecolab specifically markets their OxyCide Cleaning Products and provide the OxyCide Dilution System in conjunction with their OxyCide Cleaning Products.

51.    Defendants knew, or should have known, about the health concerns surrounding OxyCide Cleaning Products from various public health reports, hospital-staff employee complaints, and internal complaints.  Yet, Ecolab willfully or negligently declined to investigate and disclose the serious health risk to healthcare professionals and the general public, disregarded well-founded complaints, and chose to continue to risk the health of the public despite the availability of less-harmful cleaning agents.  This knowledge was exclusively in the hands of Defendants.

52.     To date, no occupational exposure limits have been established for PAA. There is limited data on PAA's exposure limits and occupational hazards for exposure to the mixture of PAA, hydrogen peroxide, and acetic acid.  Most exposure limit values are created for exposure to a single chemical substance.  At present, there are no OSHA Permissible Exposure Limits ("PEL") or NIOSH Recommended Exposure Limits ("REL") studies for occupational exposure to PAA.

53.     Further, PAA is a very potent irritant at considerably lower concentrations compared to hydrogen peroxide and acetic acid.  The methodology of testing occupational exposure utilized by OSHA only takes into account hydrogen peroxide and acetic acid individually, but not when combined to create PAA, which is significantly more hazardous.

54.     On information and belief, current analytical methodologies are not adequately quantifying the PAA levels and/or the recommended occupation exposure limits are not protective enough to ensure consumer/employee safety.

55.     NIOSH has reported that "[f]ew assessments of worker exposure to hydrogen peroxide, acetic acid, and peroxyacetic acid in healthcare settings have been conducted, despite the use of this product in more than 500 hospitals nationally."[7]

56.     In NIOSH's evaluation, EVS Staff Members reported work-related symptoms despite measured air sampling exposures that were below the established full-shift limits for hydrogen peroxide and acetic acid.  However, because both hydrogen

---

[7] Brie Hawley, PhD et al., *Notes from the Field: Respiratory Symptoms and Skin Irritations Among Hospital Workers Using a New Disinfection Product – Pennsylvani*a 2015, MORBIDITY & MORTALITY WKLY. REP., Apr. 22, 2016, https://www.cdc.gov/mmwr/volumes/65/wr/mm6515a3.htm.

peroxide and PAA are strong oxidants, it is possible that the mixture of hydrogen peroxide and PAA contributed to the symptoms reported by workers.

57.    In 2010, the National Research Council issued a report stating "Peracetic acid is extremely irritating to mucous membranes of the eyes and nasal passages at low concentrations."[8]

58.    On information and belief, Defendants knew, or should have known, about the increased concerns regarding the OxyCide Cleaning Products.  Defendants willfully and/or negligently ignored persistent warnings and failed to undertake investigations to determine the health risk associated with OxyCide.  Defendants failed to perform necessary evaluations to ensure that the OxyCide Cleaning Products are safe for use in the hospital setting.

**h.    NIOSH Recently Recommended Elimination or Substitution of OxyCide as a Primary Approach to Minimize Exposure Risk**

59.    Recently, in September 2019, the U.S. Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") – National Institute for Occupational Safety and Health ("NIOSH") issued Report No. 2017-011403357 entitled "Evaluation of exposure to hydrogen peroxide, peracetic acid, and acetic acid containing cleaning and disinfection product and symptoms in hospital employee" pursuant to its Health Hazard Evaluation Program ("HHE")[9].  The HHE was a response to a confidential

---

[8] NATIONAL RESEARCH COUNCIL, ACUTE EXPOSURE GUIDELINE LEVELS FOR SELECTED AIRBORNE CHEMICALS: VOLUME 8, NATIONAL ACADEMIES PRESS 333 (2010), https://www.nap.edu/catalog/12770/acute-exposure-guideline-levels-for-selected-airborne-chemicals-volume-8.

[9] HHE Report 2017-0114-3357 is available at http://www.cdc.gov/niosh/hhe/reports/pdfs/2017-0114-3357.pdf (last visited December 13, 2019.)

employee request for NIOSH to conduct the HHE at a Kaiser Hospital, located in Fontana, California, which is encompassed in Kaiser's Southern California Region.

60.    The request for the HHE cited "concerns about exposure of hospital employees to OxyCide, and described symptoms experienced by employees, including respiratory distress, skin problems, headaches, chest tightness, burning eyes, sore throat, and nausea."[10]  NIOSH visited the Kaiser hospital in August 2017 to observe EVS staff while they conducted cleaning tasks with OxyCide Product throughout the hospital. NIOSH collected 14 bulk samples of the diluted OxyCide Product in August 2017 to measure pH levels and returned again one year later in multiple visits to perform air sampling and health questionnaire surveys.[11]  NIOSH linked the symptoms experienced by the employees with exposure to the mixture of vapors found in OxyCide Products.  It is undisputed that irritant and allergic effects can occur with disinfectant chemical air concentrations at levels below OSHA or NIOSH exposure limits.[12]

61.    In its report, NIOSH cited studies that found occupational upper respiratory disease such as allergic rhinitis and sinusitis is often more prevalent than occupational asthma and several studies suggest that rhinosinusitis might precede or occur with lower respiratory symptoms and asthma.[13]   Additionally and importantly, upper respiratory involvement can result in suboptimal control of asthma.[14]  Although the HP and PAA levels measured in the HHE were below the established occupational exposure limits, NIOSH

---

[10] *Id.* at p. i.
[11] *Ibid.*
[12] *Id.* at p. 24.
[13] *Id.* at p. 23.
[14] *Ibid.*

still observed health effects among employees because both HP and PAA are strong oxidants, the mixture of which potentially contributed to the eye and airway symptoms reported by staff at the relatively low levels of measured exposure.[15]

62.    NIOSH's findings are consistent with Plaintiff's symptoms: they found that some employees using OxyCide reported "eye, upper respiratory, lower respiratory and skin symptoms that began during their shift."[16]  NIOSH found that "increased exposure to hydrogen peroxide, peracetic acid, or acetic acid vapors [OxyCide's chemical compounds] was associated with increases in acute, cross-shift work related nasal irritation, eye irritation, shortness of breath, and wheeze symptoms reported by hospital staff" after adjusting for age, gender, smoking status, allergic status, other sensitizer or irritant containing cleaning products used during their shift, and stress.[17]

63.    These results, according to NIOSH, indicates a need to: (1) monitor eye, respiratory, and skin symptoms among hospital cleaning staff using any cleaning products containing OxyCide's mixture, and (2) use a combination of engineering, administrative and personal protective equipment ("PPE") controls to reduce employee exposure.[18]

64.    NIOSH's primary approach to minimizing exposure risk to these harmful chemicals is to "eliminate hazardous materials or processes", however the choice to use sporicidal disinfectants like OxyCide in specific areas of the hospital should "be prudent and reflect the level of risk of healthcare-acquired infection."[19]   In the absence of

---

[15] *Ibid.*
[16] *Id.* at p. ii.
[17] *Id.* at pp. ii-iii.
[18] *Id.* at p. 25.
[19] *Ibid.*

elimination, NIOSH recommends engineering controls to reduce employees' exposures by lowering air concentrations with increased ventilation or by placing a barrier between the hazard and the employee, and such controls *should not* task the employee with primary responsibility for implementation.[20]

65.    In addition to engineering controls, NIOSH recommends that the employers implement a comprehensive system for reporting and tracking workplace injuries and illnesses that includes reports of near misses, minor injuries and illnesses, and employee safety concerns.[21]  NIOSH believes such information should be reviewed by the Safety Officer on a regular basis to identify hazards, implement risk-reduction strategies, and prevent significant injuries and illnesses.[22]

66.    What NIOSH strongly recommends is NOT placing the burden of safety precautions on the employee when using OxyCide.  NIOSH warns that "personal protective equipment is the least effective means for controlling hazardous exposures."[23]  Rather, personal protective equipment should not be used until effective engineering and administrative controls are in place.[24]  In fact, NIOSH observed some EVS staff using surgical masks or the N95 respirator mask for the purpose of respiratory protection while dispensing or working with the Products.[25]  However, NIOSH warns "these types of masks do not provide adequate, validated respiratory protection while working with products that

---

[20] *Ibid.* (emphasis added.)
[21] *Id.* at p. iii.
[22] *Ibid.*
[23] *Id.* at p. 27
[24] *Ibid.*
[25] *Id.* at p. 24.

release gases or chemical vapors."[26]   Specifically, the N95's effectiveness at mitigating

worker exposure to the organic vapors contained in OxyCide has not been validated and

therefore should not be relied upon as a means of airway/respiratory protection.[27]

i.    **Plaintiff's Experience Illustrates a Preventable Risk Caused by**
**Defendants' Failure to Implement Safeguards**

67.    On information and belief, Ecolab was on notice of serious health risks and

defects in their OxyCide Cleaning Product line shortly after its introduction.   Had

Defendants implemented readily available engineering and administrative safeguards and

adequate warnings, Plaintiff would not have endured serious and permanent injuries.

68.    Defendants misrepresented the safety and soundness of the OxyCide

Cleaning Product for use in institutions, such as healthcare settings.

69.    Defendants failed to provide adequate engineering and administrative

controls and/or adequately warn healthcare professionals and the general public within the

vicinity of the OxyCide Cleaning Product's use to wear necessary protective garments and

masks, or to clean with the Product only in a well-ventilated area.

70.    The New Jersey Department of Health and Senior Services reported that

PAA (Peroxyacetic Acid), the active ingredient in OxyCide Cleaning Products, "is a

HIGHLY CORROSIVE CHEMICAL and contact can severely irritate and burn the skin

and eyes leading to eye damage.   Breathing Peroxyacetic Acid can irritate the nose and

throat.   Breathing Peroxyacetic Acid can irritate the lungs causing coughing and/or

---

[26] *Ibid.*
[27] *Ibid.*

shortness of breath.  Higher exposures can cause a build-up of fluid in the lungs (pulmonary edema), a medical emergency, with severe shortness of breath."[28]

71.    Ecolab's OxyCide Safety Data Sheet states that when the product is as sold, inhalation is "[t]toxic if inhaled.  May cause nose, throat, and lung irritation."

72.    Had Defendants provided adequate engineering and administrative safeguards and warnings, Plaintiff would have undertaken necessary precautions when around OxyCide Cleaning Products to protect herself from its hazardous chemicals.

73.    Ecolab also failed to reasonably analyze the occupational exposure limits for PAA despite knowing or reasonably knowing hospital workers nationwide were experiencing serious respiratory, asthma, eye and skin complications as a result of the OxyCide Cleaning Products.  Instead, Defendants were content with stating that no special protective equipment is required to protect users from diluted OxyCide Cleaner, as long as their products were being sold on the market and met OSHA or NIOSH exposure limits.

74.    Ecolab's Safety Data Sheet only states the short-term exposure limit for PAA is at 0.4 parts per million.  Defendants failed to investigate safety concerns regarding their OxyCide Cleaning Products and possible long-term exposure complications even after complaints of harmful effects suffered by employees from the use of the OxyCide Cleaning Products.

75.    Further, PAA monitoring systems are readily available on the market and provide immediate indication of PAA concentrations in the work area, so that workers can

---

[28] HAZARDOUS SUBSTANCE FACT SHEET, PEROXYACETIC ACID, NEW JERSEY DEPARTMENT OF HEALTH & SENIOR SERVICES (Mar. 1998, Rev. Oct. 2004), http://nj.gov/health/eoh/rtkweb/documents/fs/1482.pdf.

protect themselves from acute and chronic exposure to PAA.  Continuous monitoring of PAA can help protect employees from the acute and chronic health affects by reporting the toxic concentrations in real time and providing alarms for proactive protection.

76.    A continuous monitoring system, adequate ventilation, along with a comprehensive education and reporting program and safe work practices are quick methods to assure worker safety and maximize productivity.

77.    On information and belief, Defendants failed to recommend and/or require accurate PAA monitoring systems to ensure consumer and user safety to prevent acute or chronic exposure to hazardous chemicals from their defective OxyCide Cleaning Products. In fact, Ecolab's Safety Data Sheet states no special monitoring, ventilation, engineering safeguards and/or protective equipment required for eye, hand, skin, and respiratory protections.  Had Defendants acted reasonably to safeguard their consumer, employee, and/or the general public's health and offer a solution to ensure safe PAA levels, Plaintiff would not have endured serious and permanent injuries.  A PAA monitor would have necessarily provided accurate and advanced warnings of any defective OxyCide Cleaning Products.  Had Defendants provided adequate product warnings or required PAA monitoring systems and disclosed the need for engineering and administrative safeguards, Plaintiff would have had limited hazardous OxyCide exposure and advanced warning to leave the hazardous area in the absence of such safeguards.

**j.    Defendants Misrepresented the Safety of OxyCide Cleaning Products**

78.    On information and belief, Defendants made material misrepresentations, fraudulently concealed information, and/or and intentionally omitted material information

22

to healthcare professionals, Plaintiff, government officials, and/or the general public, causing serious and permanent damage to Plaintiff, and others similarly situated.

79.    On information and belief, Defendants falsely marketed its OxyCide Cleaning Products as a safe and effective disinfectant to healthcare professionals, consumers, Plaintiff, and/or the general public, despite knowledge to the contrary.

80.    On information and belief, Ecolab's Safety Data Sheet misrepresented that OxyCide Cleaner does not require personal protective equipment or engineering safeguards when automatically diluted, despite knowledge to the contrary.

81.    On information and belief, Defendants misrepresented in marketing and advertising claims that a low incidence of side effects was associated with the use of OxyCide Cleaning Products.

82.    On information and belief, Defendants misrepresented the adverse results of clinical investigations of OxyCide Cleaning Products.

83.    Plaintiff would not have suffered such serious injuries had Defendants revealed necessary information regarding the hazardous OxyCide Cleaning Products, taken necessary precautions, and/or ceased use of OxyCide Cleaning Products following serious health related complaints.

## V.    CAUSES OF ACTION

## COUNT I – STRICT LIABILITY – DESIGN DEFECT

84.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

85.    Plaintiff is informed and believes, and upon such information and belief, alleges that Defendants designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed, instructed, warned, and sold OxyCide Cleaning Products.

86.    At all times relevant hereto, Defendants knew that the OxyCide Cleaning Products would be operated and used by healthcare professionals nationwide without inspection for defects.

87.    At the time of the incident described above, the OxyCide Cleaning Products were being used in a manner and fashion that was foreseeable by Ecolab, and in a manner in which it was intended to be used.

88.    Defendants designed, engineered, developed, manufactured, produced, assembled, equipped, tested, or failed to test, inspected or failed to inspect, repaired, retrofitted, or failed to retrofitted, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, instructed on use, warned, and sold the cleaning products and its component parts and constituents, which was intended by Ecolab to be used for the purposes of use as a disinfectant, and other related activities.

89.    As a direct and proximate result of said design defects, while using said toxic chemical product and machines and PAA containing products in a manner that was reasonably foreseeable and intended by Ecolab, Plaintiff was exposed to toxic chemicals released from each of said toxic chemical products, and machines and the PAA containing products, and a result, suffered serious injuries and medical conditions.

90.    Defendants designed the cleaning products and the accompanying instructions and warnings defectively, causing them to fail to perform as safely as an ordinary consumer would expect when in an unintended or reasonably foreseeable manner.

91.    In addition, OxyCide Cleaning Products, as manufactured and supplied by Defendants, were defective due to inadequate post-marketing warnings or instructions because after Defendants knew or should have known the risk of injuries from use, Defendants failed to provide adequate warnings to the community of OxyCide users and the consumers, to whom it was directly marketing and advertising, and further, it continued to affirmatively promote OxyCide Cleaning Products as safe and effective.

92.    A reasonable person who had actual knowledge of the increased risks associated with using the OxyCide Cleaning Products would have concluded that the OxyCide Cleaning Products should not have been marketed and/or sold to hospitals for use by hospital employees.

93.    Despite the fact that the Defendants knew or should have known of the defective nature of the OxyCide Cleaning Products, Defendants continued to design, manufacture and sell the OxyCide Cleaning Products as to maximize sales and profits and the expense of public health and safety.  Defendants thus acted with conscious and deliberate disregard of the foreseeable harm cause by the OxyCide Cleaning Products.

94.    The risks inherent in the design of the cleaning products outweigh significantly any benefit of such design.

95.    Plaintiff was not aware of the aforementioned defects and could not, through the exercise of reasonable care, have discovered the risk of injury associated with OxyCide Cleaning Products.

96.    As a legal and proximate result of the aforementioned defective and/or unreasonably dangerous condition of the OxyCide Cleaning Products, the product was used by Plaintiff and as a result of the cleaning products, Plaintiff sustained the injuries and damages set forth herein.

97.    Information given by Defendants to the hospitals and their employees concerning the safety and efficacy of the OxyCide Cleaning Products, especially the information contained in the advertising, promotional, instructions, warnings, and safety data sheets, did not accurately reflect the risks associated with using the product.

98.    Had adequate information regarding the safety of the products been provided, Plaintiff would not have used the OxyCide Cleaning Products.  Had adequate warnings and/or instructions been provided, Plaintiff would not have used the OxyCide Cleaning Products.

99.    Defendants acted with conscious and/or deliberate disregard of the foreseeable harm caused by use of its products. As a direct and proximate consequence of Defendants' negligence, willful, wanton, and/or intentional acts, omissions, misrepresentations, and/or otherwise culpable acts, Plaintiff suffered the injuries and damages alleged herein.

100.   Plaintiff therefore demands judgment against Defendants and seeks compensatory and exemplary damages, together with interest, and the costs of suit and attorneys' fees and such other and further relief and this Court deems just and proper.

## COUNT II – STRICT LIABILITY – MANUFACTURING DEFECT

101.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

102.   At all times material to this action, Ecolab was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, instructing, warning, and/or selling the OxyCide Cleaning Products and otherwise putting the product into the stream of commerce.

103.   At all times material to this action, the OxyCide Cleaning Products were expected to reach, and did reach consumers and healthcare professionals throughout the United States, including Plaintiff, without significant change in the condition in which the OxyCide Cleaning Products was distributed and/or sold.

104.   At all times material to this action, the OxyCide Cleaning Products were designed, developed, manufactured, tested, packaged, marketed, distributed, labeled, instructed, warned, and/or sold by Defendants in a deceptive and unreasonably dangerous condition in one or more of the following particulars:

    a.   When placed in the stream of commerce, the OxyCide Cleaning Products contained manufacturing defects in that it caused and/or increased the risk of experiencing adverse health effects, including but not limited to, respiratory irritations, shortness of breath, loss of voice,

27

coughing, sneezing, inability to breath, swelling, burning of the eyes, nose and mouth, skin and nail irritations, rash, nausea, vomiting, and other physical injuries which rendered the product unreasonably dangerous;

b.  When placed into the stream of commerce, the OxyCide Cleaning Products contained manufacturing defects which resulted in lot to lot variability which rendered the products unreasonably dangerous;

c.  The OxyCide Cleaning Products' manufacturing defects were created while the product was in the possession and control of Defendants;

d.  The OxyCide Cleaning Products were not manufactured in accordance with Defendants' specifications or performance standards and/or the product deviated from the approved plans and specifications therefore;

e.  The manufactured product composition post-marketing was materially different from the pre-market product; and

f.  The manufactured product deviated from the product design and manufacturing defects existed in the product before it left Defendants' control.

105.  As a direct and proximate result of Defendants' negligent acts, omissions, carelessness, recklessness, and gross negligence, including their failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiff suffered severe and permanent

physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which he is entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial.  Defendants are liable for all general, special, and compensatory damages and equitable relief to which Plaintiff is entitled by law.

### COUNT III – STRICT LIABILITY – FAILURE TO WARN

106.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

107.    Ecolab designed, engineered, developed, manufactured, produced, assembled, equipped, tested, or failed to test, inspected or failed to inspect, repaired, retrofitted, or failed to retrofitted, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, instructed, provided the warnings, and sold the OxyCide Cleaning Products and its component parts and constituents, which was intended by Defendants to be used for the purposes of use as a disinfectant, and other related activities.

108.    At all times relevant hereto, Defendants knew that OxyCide Cleaning Products would be used and operated by healthcare professionals without inspection for defects or risks beyond those identified by Ecolab.

109.    At the time of the incident described above, OxyCide was being used in a manner and fashion that was foreseeable by Defendants, and in a manner in which it was intended to be used.

110.    A substantial number of hospital employees suffered adverse health effects from exposure to chemicals and compounds in Ecolab's OxyCide Cleaning Products.

111.    The dangers posed to people by the chemicals and compounds in Ecolab's defective OxyCide Cleaning Products are not generally known or, if known, reasonable people would not expect the dangerous chemicals to be in the diluted product without proper warnings and instructions on use.

112.    Defendants knew, or by use of scientific knowledge available at the time, should have known of the danger of the components/ingredients individually or wholly combined.

113.    Defendants failed to provide adequate instructions and warnings concerning the chemicals' dangers.

114.    Defendants' lack of adequate instructions and warnings was a substantial factor in legally and proximately causing Plaintiff harm.

115.    Defendants failed to properly warn users that in 2015 OxyCide was listed as an asthmagen, a substance that can cause asthma, by the Association of Occupational and Environmental Clinics.

116.    Defendants failed to properly warn users that OxyCide is a known respiratory sensitizer, which can cause an immune response and adverse respiratory effects, even at low levels of exposure.

117.    Defendants failed to provide adequate warnings of respiratory distress, vocal cord dysfunction, acute inhalation injuries, asthma and asthma-like symptoms, and its propensity to cause and/or contribute to serious injuries.

118.    Defendants failed to properly warn users to keep a lid on the OxyCide Cleaners whenever possible to minimize the generation of PAA, hydrogen peroxide, and acetic acid vapors that can be inhaled and cause injury to one's health.

119.    Defendants failed to properly warn users that adequate engineering and administrative safeguards are required to mitigate against exposure to OxyCide's harmful vapors and gases.

120.    Defendants failed to make timely corrections to the design of the OxyCide Cleaner and OxyCide Dilution System to correct the known or knowable hazardous chemical compounds that were inhaled by health care employees and caused damage and injury to their health.

121.    Plaintiff was not aware of the aforementioned dangers.

122.    As a legal and proximate result of the aforementioned inadequate warning on the cleaning products, Plaintiff sustained the injuries and damages set forth herein.

123.    Plaintiff, therefore, is entitled to damages in an amount to be proven at the time of trial.

## COUNT IV – NEGLIGENCE

124.    Plaintiff incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

125.    At all relevant times, Defendants had a duty to exercise reasonable care to users of the products, including Plaintiff herein, in all conduct associated with putting the OxyCide Cleaning Products into the stream of commerce including, but not limited to, designing, developing, manufacturing, testing, inspecting, packaging, promoting,

marketing, distributing, labeling, instructing, warning, and/or selling of the OxyCide Cleaning Products.

126.    At all relevant times, the Defendants had a duty to comply with all applicable laws and standards in all conduct associated with putting the OxyCide Cleaning Products into the stream of commerce including, but not limited to, designing, developing, manufacturing, testing, inspecting, packaging, promoting, marketing, distributing, labeling, instruction, warning, and/or selling of the OxyCide Cleaning Products.

127.    Defendants breached their duty of reasonable care to Plaintiff in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, instructed, warned, used and/or sold the OxyCide Cleaning Products.

128.    Plaintiff's injuries and damages alleged herein were and are the direct and proximate result of the Defendants' negligent acts, omissions and violations of applicable laws and standards including, but not limited to, the following:

    a.    Failure to exercise reasonable care in manufacturing, distributing, designing, selling, testing, instructing, warning, and servicing of the OxyCide Cleaning Products and its component parts in order to avoid the aforementioned risk to individuals;

    b.    Failure to adequately warn and/or instruct users and/or healthcare professionals of the OxyCide Cleaning Products, including Plaintiff herein, of said products' known dangerous and defective characteristics;

32

c.   Failure to incorporate within the OxyCide Cleaning Products and its design reasonable safeguards and protections against dangerous and consequences thereof;

d.   Failure to exercise reasonable care in their design, development, implementation, administration, supervision and/or monitoring of clinical trials for the OxyCide Cleaning Products;

e.   Promoting the Cleaning Products in an aggressive, deceitful and fraudulent manner, despite knowledge of the OxyCide Cleaning Products' defective and dangerous characteristics including its propensity to cause serious injury;

f.   Representing that the product was safe for its intended use when, in fact, the Cleaning Products were unsafe for its intended use;

g.   Failure to make timely corrections to OxyCide Cleaning Products' design to correct hazardous defects;

h.   Concealment of known dangers and other claims of injury and health consequences from the use of OxyCide;

i.   Failure to adequately identify and mitigate hazards associated with OxyCide Cleaning Products in accordance with good design and manufacturing practices and other ways;

j.   Use of PAA – a dangerous oxidizing agent – at a concentration, level and administration hazardous to healthcare professionals and the public;

33

k.    Failure to perform appropriate pre-market testing of the OxyCide Cleaning Products;

l.    Failure to perform appropriate post-market testing of the OxyCide Cleaning Products; and,

m.    Failure to perform appropriate post-market surveillance of the OxyCide Cleaning Products;

n.    Failure to report to the general public those data which indicated risks associated with using the OxyCide Cleaning Products.

129.    Defendants knew, or should have known, that consumers such as Plaintiff herein would suffer injury as a result of the Defendants' failure to exercise reasonable and ordinary care. Despite such knowledge of the dangers of the OxyCide Cleaning Products, Defendants failed to remedy or warn of the product's known hazards that posed a grave threat of injury. Defendants acted despite such knowledge that harm was substantially certain to occur. Defendants had a duty to warn the public, the medical community, and the employees of the medical community about the increased risks and refused to do so placing profits, stock options and bonuses ahead of consumer safety.

130.    At all relevant times, the Defendants had a duty and obligation to refrain from violations of law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, instructing on use, warning of the risks and dangers of the OxyCide Cleaning Products, and otherwise distributing the products.

131.    As a direct and proximate result of Defendants' negligent acts, omissions, carelessness, recklessness and gross negligence, including their failure to comply with applicable laws and standards as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiff suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which Plaintiff is entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial.  Defendants are liable jointly and/or severally for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law.

## COUNT V – BREACH OF EXPRESS WARRANTY

132.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

133.    Defendants expressly warranted that (1) the OxyCide Cleaning Products were safe and fit for use by healthcare professionals, consumers, users, including Plaintiff; (2) the OxyCide Cleaning Products were fit for its intended purpose; (3) the OxyCide Cleaning Products were of merchantable quality; (4) the OxyCide Cleaning Products did not pose any unreasonable risks or dangers; and (5) the OxyCide Cleaning Products were adequately tested and found fit for its intended use.

134.    At the time that Defendants made the express warranties, Defendants knew or should have known of the purpose for which the OxyCide Cleaning Products were to be used and Defendants warranted the same to be, in all respects, as fit, safe, and effective and

proper for such purpose, as a disinfectant cleaner and automated dilution management system.

135.    At the time that Defendants made the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the OxyCide Cleaning Products were not safe and not fit for its intended use and, in fact, posed serious risks of injuries to the user.

136.    Members of the healthcare community including, but not limited to, Plaintiff, physicians, patients, and health care workers, reasonably relied upon the skill and judgment of Defendants, and upon said express warranties, in distributing, recommending, selling, advertising, and/or dispensing the OxyCide Cleaning Products.

137.    Defendants intended and expected members of the healthcare community to rely upon Defendants' express warranties.

138.    Defendants intended and expected Plaintiff to rely upon Defendants' express warranties.

139.    Plaintiff herein reasonably relied on the Defendants' express warranties.

140.    Defendants materially breached said express warranties in that the OxyCide Cleaning Products are not and, at all relevant times, were not safe and fit for its intended use and, in fact, caused debilitating and potentially lethal side effects with greater frequency than safer alternative methods of disinfectant.

141.    As a direct and proximate result of Defendants' wrongful conduct, material breach of express warranties, and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the product, Plaintiff

suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which Plaintiff is entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendants are liable for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law.

## COUNT VI – BREACH OF IMPLIED WARRANTY

142.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

143.    Defendants designed, manufactured, marketed, distributed, supplied and sold the OxyCide Cleaning Products as a daily disinfectant cleaner and automated dilution system.

144.    At the time that the Defendants manufactured, marketed, distributed, supplied, and/or sold the Cleaning Products, they knew of the use for which the OxyCide Cleaning Products were intended and impliedly warranted that the products were of merchantable quality and safe and fit for such use.

145.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

146.    Plaintiff was exposed to the OxyCide Cleaning Products for its intended purpose.

147.    Due to the Defendants' wrongful conduct as alleged herein, Plaintiff could not have known about the true nature of the risks and side effects associated with the OxyCide Cleaning Products until after Plaintiff used and/or was exposed to the products.

148.    Contrary to and in material breach of Defendants' implied warranties regarding the OxyCide Cleaning Products, the products were not of merchantable quality; and was not safe or fit for its intended uses and purposes including, but not limited to, as a daily disinfectant.

149.    As a direct and proximate result of Defendants' wrongful conduct, material breach of implied warranties, and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiff suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which he is entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial.  Defendants are liable for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law.

### COUNT VII – INTENTIONAL MISREPRESENTATION

150.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

151.    Defendants marketed, promoted, and/or advertised the OxyCide Cleaning Products to healthcare professionals and/or the general public.

152.    In disseminating information to healthcare professionals and the general public, Defendants had a duty to disseminate truthful information and a parallel duty not to deceive healthcare professionals, the U.S. Food and Drug Administration ("FDA"), the U.S. Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), Plaintiff, and/or the general public.

153.    In breach of their duties not to deceive, Defendants made material misrepresentation of fact, concealed material information and/or otherwise falsely and fraudulently represented to Plaintiff, the medical and healthcare community, and to the public, that the OxyCide Cleaning Products had been tested and were found to be safe and effective for use as a daily disinfectant and automated dilution management system.

154.    In breach of their duties not to deceive, Defendants fraudulently concealed and misrepresented material information in their own studies that, *inter alia*, their OxyCide Cleaning Products significantly increased risks posed.

155.    Defendants made material misrepresentations to healthcare professionals, consumers, Plaintiff, and/or the general public, fraudulently concealed material facts, and intentionally omitted material information.  Such material misrepresentations, fraudulent concealments of material facts, fraudulent acts and omissions include, but are not limited to, the following:

        a.    Defendants falsely represented that the side effects and risks of the use of the OxyCide Cleaning Products were the same as and not greater than risks posed by other disinfectants;

b.  Defendants falsely advertised, marketed, and/or claimed that their OxyCide Cleaning Products were safe, despite knowing they were unsafe to Plaintiff, healthcare professionals, patients, and/or the general public;

c.  Defendants fraudulently concealed material information and misrepresented the risks of acute respiratory failure events associated with the use of the OxyCide Cleaning Products;

d.  Defendants fraudulently concealed and misrepresented in marketing and/or advertising claims that a low incidence of side effects was associated with the use of OxyCide Cleaning Products;

e.  Defendants fraudulently concealed the increased risks of short-term and long-term exposure and other adverse events caused by the OxyCide Cleaning Products – despite the fact that Ecolab knew or should have known that scientific studies demonstrated a substantial risk;

f.  Defendants fraudulently concealed and misrepresented the adverse results of clinical investigations of their products;

g.  Defendants falsely represented its OxyCide Cleaning Products as superior to other disinfectants despite knowledge that it knew or should have known that scientific studies demonstrated their OxyCide Cleaning Products posed significantly greater risks of respiratory complications and other serious side effects;

      h.     Defendants falsely represented known dangers and serious health consequences from the use of OxyCide Cleaning Products; and

      i.     Defendants failed to inform Plaintiff, healthcare professionals, FDA, EPA, OSHA, NIOSH, and/or the general public that short-term and long-term exposure limits did not fully and accurately test PAA's occupational risk.

156.    Defendants knew these representations to be false when made and Defendant made such representations in willful, wanton, and reckless disregard of the truth.

157.    As a result of Defendants' research, testing, knowledge of prior complaints from healthcare workers at hospitals throughout the United States, and publicized complaints about the harmful symptoms experience from healthcare workers at other hospitals in other states from exposure to OxyCide, Defendants knew or should have known that the information they intentionally distributed was false including, but not limited to, assuring the healthcare professionals, hospitals, the FDA, the EPA, OSHA, NIOSH, Plaintiff, and/or the general public hospitals that the OxyCide Cleaning Products were safe for use as a means of daily disinfectant and dilution system.

158.    On information and belief, Defendants omitted data from testing and research of their products and hid the true dangers of the products in reporting to the general public, healthcare professionals, Plaintiff, OSHA, NIOSH, the EPA and the FDA.

159.    Defendants distributed and published reports, press releases, advertising campaigns, and other commercial media to the public, OSHA, NIOSH, the FDA, the EPA,

healthcare professionals, and/or Plaintiff that contained material misrepresentations of fact and/or omissions of material fact concerning their OxyCide Cleaning Products.

160.    The information distributed to healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiff, and/or the general public by Defendants intentionally included representations that Defendants' products were safe for use as a daily disinfectant and dilution system.

161.    The information distributed to healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiff, and/or the general public intentionally included false representations that the products were not injurious to the health and/or safety of their intended users and that the OxyCide Cleaning Products' risks to their users' health and/or safety were the same as the risks posed by other daily disinfectants and dilution systems.

162.    Defendants intentionally suppressed, ignored and disregarded unfavorable test results as well as actual complaints from healthcare workers that demonstrated that its products were not safe as a means of daily disinfectant and dilution system.

163.    Plaintiff was unaware of the falsity of said representations, reasonably believed said representations to be true and reasonably relied upon said representations and were induced to, used and/or exposed the OxyCide Cleaning Products, thereby sustaining severe and permanent personal injuries.

164.    Defendants knew and/or should have known that the OxyCide Cleaning Products had not been sufficiently tested, were unsafe, defective in design and manufacture, unreasonably dangerous and/or lacked adequate and/or sufficient warnings.

165.    Defendants knew and/or should have known that their OxyCide Cleaning Products could and would cause severe and permanent injury to users and that its products are inherently dangerous in a manner that exceeded all product warnings issued by Defendants.

166.    Defendants had sole access to material facts concerning the defective nature of their OxyCide Cleaning Products and their propensity to cause serious and dangerous side effects and to cause injury and damage to persons who used or were exposed to such products, including the Plaintiff herein.

167.    Through the material misrepresentations and intentional concealments of material facts as alleged herein, Defendants intended to deceive and defraud healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiff, and/or the general public to falsely inspire confidence in the quality and fitness for use of their products and intended to induce healthcare professionals and the general public to use, purchase, request, dispense, prescribe, recommend, and/or continue to use their OxyCide Cleaning Products.

168.    Defendants willfully and intentionally concealed and failed to disclose material facts and made false representations with the purpose, intent and design of deceiving and lulling Plaintiff, healthcare professionals, and/or the general public into a false sense of security so that Plaintiff would rely on the representations, purchase and use the OxyCide Cleaning Products and so that healthcare professionals would dispense, prescribe, and/or recommend the product.

169.    Defendants knew or should have known that Plaintiff, healthcare professionals, and the general public would rely upon the information that Defendants

disseminated through their public relations campaigns which included, but were not limited to, public statements and press releases.

170.    Plaintiff, healthcare professionals, and/or the general public believed that the Defendants' representations were true at the time they were made, reasonably relied upon such representations and reasonably relied on the Defendants' superior knowledge of their products, reasonably relied on the Defendants' selective recitation of facts and absence of adverse facts that were negligently, fraudulently and/or purposefully concealed and/or omitted by the Defendants.  Plaintiff, healthcare professionals, and/or the general public were thereby induced to purchase, use, dispense, prescribe, recommend, and/or exposed to the product.

171.    At the time the representations were made, Plaintiff, healthcare professionals, and/or the general public did not know the truth with regard to the dangerous and serious health and/or safety risks of the OxyCide Cleaning Products.

172.    Plaintiff had not discovered all of the true facts, all of the dangerous and serious health/safety risks, all of the false representations made, nor had Plaintiff discovered all of the Defendants' wrongful conduct concerning the product, as such discovery is still ongoing and discovery of the Defendant acts, omissions and other wrongful conduct concerning the product is continuing in this matter.

173.    Had Plaintiff known the true facts with respect to the dangerous and serious health and/or safety risks posed by the OxyCide Cleaning Products, Plaintiff would have taken action to not be exposed to the Products.

174.    Defendants' concealment of material facts and misrepresentations as alleged herein concerning, *inter alia*, the safety of their products, were made purposefully, willfully, wantonly, and/or recklessly, in order to mislead Plaintiff, healthcare professionals, hospitals, and/or the general public into reliance, continued use of the product, and actions thereon, while Defendants knew that said persons and entities were unable to determine the truth behind the Defendants' concealment and omissions, as set forth herein.  Said acts and omissions as alleged herein evinces a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff and the general public.

175.    As a direct and proximate result of Defendants' acts, omissions, wrongful conduct and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiff suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which he is entitled to recover including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendants are liable for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law.

**COUNT VIII – NEGLIGENT MISPRESENTATION**

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

177.   At all relevant times alleged herein, Defendants had a duty to, *inter alia*, truthfully, fully and accurately inform healthcare professionals, Plaintiff, government officials, and the general public of all facts concerning the OxyCide Cleaning Products' testing, safety, risks and efficacy for its intended purpose.

178.   Defendants materially breached its duty to, *inter alia*, truthfully, fully and accurately inform Plaintiff, the healthcare community, OSHA, NIOSH, the FDA, the EPA, and/or the general public of all facts concerning the products' testing, safety, risks and efficacy.

179.   At the times relevant herein, Defendants held a position of unique knowledge concerning the risks posed by the OxyCide Cleaning Products.  Defendants intentionally and/or negligently concealed the defects and hazardous effects of OxyCide Cleaning Products.  Plaintiff had no knowledge of the safety risks associated with OxyCide Cleaning Products.  Defendants took advantage of the limited opportunity Plaintiff had to discover Defendants' strategic and intentional and/or negligent concealment of the defects in the OxyCide Cleaning Products.

180.   Through their unique knowledge and expertise regarding the defective nature of the OxyCide Cleaning Products, and through their marketing of these products, including statements to healthcare professionals in advertisements, promotional materials, and other communications, Defendants convinced hospitals and healthcare professionals nationwide that Defendants possessed facts demonstrating that its products are and, at all relevant times, were safe and effective for their intended use and were free of defects.

181.   Defendants' representations to Plaintiff were unqualified statements made to induce Plaintiff to use and/or be exposed to the OxyCide Cleaning Products.  Healthcare professionals and hospitals reasonably relied upon the statements made by Defendants when purchasing and using the OxyCide Cleaning Products and Plaintiff reasonably relied upon those same statements.  Defendants took unconscionable advantage of its dominant position of knowledge with regard to Plaintiff and engaged in constructive fraud in their relationship with Plaintiff.

182.   Defendants' concealments, misrepresentations and omissions were undertaken in order to induce Plaintiff, and the general public to use and be exposed to Ecolab's OxyCide Cleaning Products and choose, recommended, and/or use said products over other safer alternative disinfectants and methods on the market and, at all relevant times, Plaintiff reasonably relied on Defendant's acts and omissions.

183.   Defendants failed to exercise ordinary care in their representations concerning their OxyCide Cleaning Products and engaged in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of their products into interstate commerce while negligently misrepresenting that the products had been fully tested and found to be safe, that the products were safe and free of material risks to their users, thereby breaching their duties to truthfully and accurately represent the products' side effects and risks to Plaintiff, the medical and healthcare community and/or to the general public.

184.   Defendants' promotional and marketing campaigns contained material misrepresentations concerning the safety, risks, soundness and reliability of their products. Said promotional and marketing campaigns concealed the true material information known

by Ecolab concerning the risks posed by their products. To date, Defendants continue to misrepresent OxyCide Cleaning Products through their promotional and marketing campaign.

185.    Defendants misrepresented and concealed material deviations in the manufactured OxyCide Cleaning Products from the approved designs and therefore also concealed the resulting high risk of injuries and adverse events posed by said manufacturing defects in the products.

186.    As a direct and proximate result of Defendants' acts, omissions, wrongful conduct and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiff suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which he is entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendants are liable for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law.

## COUNT IX – FRAUDULENT CONCEALMENT

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

188.    Defendants fraudulently concealed information with respect to the OxyCide Cleaning Products, including, but not limited to, the following particulars:

a.  Defendants represented through oral representations, labeling, advertising, marketing materials, and publications that OxyCide Cleaning Products had been tested and found to be safe.

b.  Defendants represented through oral representations, labeling, advertising, marketing materials, and/or publications that OxyCide Cleaning Products were safe without use of protective equipment.

c.  Defendants had sole access to material facts concerning the dangers and unreasonable risks of OxyCide Cleaning Products.

d.  The concealment of information by Defendants about the risks of OxyCide Cleaning Products was intentional, and the representations made by Defendants was known to be false.

189.  The concealment of information and the misrepresentations about OxyCide Cleaning Products were made by Defendant with the intent that healthcare professionals, governmental agencies, NIOSH, OSHA, EPA, FDA, and the general public, including Plaintiff, would rely upon them.

190.  Plaintiff relied upon the representations and was unaware of the substantial risks of the OxyCide Cleaning Products which Defendants concealed.

191.  Defendants' conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of healthcare professionals, including Plaintiff.

192.  As a direct and proximate result of the acts and conduct of Defendants, Plaintiff has been injured, and has suffered, continues to suffer and, on information and

belief, will suffer indefinitely into the future, severe, lasting, and debilitating physical and mental pain and suffering, for which Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

193.    As a further direct and proximate result of the acts and conduct of Defendants, Plaintiff has lost earnings and earning capacity and will continue to incur such losses for an indefinite period of time in the future, in an amount to be proven at trial.

194.    As a further direct and proximate result of the acts and conduct of Defendants, Plaintiff has incurred medical, hospital, and related expenses and, on information and belief, will continue to incur such expenses in the future, for which Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

195.    WHEREFORE, Plaintiff demands judgment against Defendants and requests compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## VI.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

196.    Plaintiff files this lawsuit within all applicable limitation periods of first suspecting that OxyCide Cleaning Products caused their injuries.  Plaintiff could not, by the exercise of reasonable and due diligence, have discovered at an earlier point in time that OxyCide Cleaning Products were the cause of his injuries because the cause was unknown to Plaintiff until recently.  Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until recently.  Plaintiff exercised due diligence to discover Defendants'

wrongdoing. However, such wrongdoing and/or the full extend and degree of such wrongdoing was not discoverable prior to the date of the filing of this action and/or prior to four years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation. Plaintiff exercised due diligence by promptly filing this Complaint after discovery the facts giving rise to these claims.

197. Additionally, any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of material facts by Defendants. Through its affirmative misrepresentations and omissions, Defendants actively concealed from healthcare professionals, governmental agencies, and/or the general public, including Plaintiff, the risks associated with OxyCide Cleaning Products. Defendants have kept Plaintiff ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on Plaintiff's part. Defendants' fraudulent concealment did result in such delay. Plaintiff could not reasonably have discovered these claims until shortly before filing this complaint.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgement against Defendants and that Plaintiff be awarded equitable relief, and damages under all other causes of action, from Defendants, as follows:

A.    Award all actual, general, special, incidental, statutory, and consequential damages and restitution to which Plaintiff is entitled;

B.    Award pre-judgement and post-judgement interest on such monetary relief;

C.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ecolab to refrain from the distribution and use of the Product or in the alternative, include adequate warnings and precautions, and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff with appropriate curative notice regarding the existence of toxic and dangerous chemicals;

D.    Award reasonable attorneys' fees and costs; and

E.    Grant such further relief this Court deems appropriate.

## VIII.    JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  August 19, 2020

Respectfully submitted,

*/s/ Timothy Becker*
Timothy Becker, Esq. (MN Bar #256663)
Jacob Rusch, Esq. (MN Bar #391892)
JOHNSON BECKER, PLLC
444 Cedar St., Ste. 1800
St. Paul, MN  55101
Telephone: (612) 436-1800
Facsimile: (612) 436-1801
tbecker@johnsonbecker.com
jrusch@johnsonbecker.com

In association with:

MCCUNE WRIGHT AREVALO LLP

*s/ Michele M. Vercoski*
Michele M. Vercoski*
California State Bar No. 244010
Richard D. McCune*
California State Bar No. 132124
Tuan Q. Nguyen*
California State Bar No. 312153
18565 Jamboree Road, Suite 550
Irvine, CA  92612
Tel: (909) 557-1250
Fax: (909) 557-1275
mmv@mccunewright.com
tqn@mccunewright.com

*Pro Hac Vice* Application to be Submitted