# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Leslye Hernandez,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Ecolab, Inc. and Does 1–100,<br><br>　　　　　Defendants. | Case No. 20-cv-1806 (SRN/ECW)<br><br><br>**ORDER ON DEFENDANTS'<br>MOTION TO EXCLUDE EXPERT<br>TESTIMONY AND FOR SUMMARY<br>JUDGMENT** |

Michele M. Vercoski and Richard Dale McCune, Jr., McCune Wright Arevalo, LLP, 18565 Jamboree Rd., Ste. 550, Irvine, CA 92612; Timothy J. Becker and Jacob Robert Rusch, Johnson Becker PLLC, 444 Cedar St., Ste. 1800, St. Paul, MN 55101, for Plaintiff

Michelle Rognlien Gilboe, Carli D. Pearson, Douglas L. Pfeifer, Richard G. Morgan, Alexa Ely, and Cameron Woods, Lewis Brisbois, 90 S. 7th St., Ste. 2800, Minneapolis, MN 55402; Aengus Hartley Carr, Lewis Brisbois, 45 Fremont St., Ste. 3000, San Francisco, CA 94105, for Defendants

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Exclude the Testimony of Dr. Robert Harrison [Doc. No. 27] and the Motion for Summary Judgment [Doc. No. 43] filed by Defendants Ecolab, Inc. and Does 1–100. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court denies Defendants' Motion to Exclude and grants in part and denies in part Defendants' Motion for Summary Judgment.

# I.     BACKGROUND

## A.     Factual Background

Between approximately October 2019 and April 2020, Plaintiff Leslye Hernandez, a California resident, worked as an environmental services ("EVS") technician at Pomona Valley Hospital in Pomona, California.[1]  (Morgan Summ. J. Decl. [Doc. No. 46], Ex. 11 (Hernandez Dep.) at 42:5-10, 53:16-54:1; 80:4-6.)  Hernandez has suffered from lifelong asthma, and, as a child in her native Mexico, was hospitalized for the condition on one or two occasions.  (*Id*. at 226:7-:22.)   Since moving to the United States, she has not been hospitalized for her asthma.  (*Id*. at 226:20-:22.)  Prior to her OxyCide exposure, Hernandez managed her asthma with an inhaler once or twice a month and a nebulizer on rare occasions when she was sick.  (*Id*. at 44:8-19.)  In addition to asthma, Ecolab's expert, Dr. Kerger, observes that notations in Hernandez's medical records from 2020 indicate that, at that time, she suffered from gastroesophageal reflux ("GERD") and her body mass index ("BMI") was between 31 and 33.  (*See* Morgan Summ. J. Decl., Ex. 9 (Kerger Report) at 4, 7–8.)  While Hernandez has never smoked cigarettes, in January 2020, she consumed medicinal marijuana in edible form and inhaled marijuana through a water pipe to alleviate pain associated with injuries from a fall.  (Hernandez Dep. at 248:20-250:21, 260:6-:8.)

---

[1] Specifically, Hernandez worked at the hospital from October 1, 2019 through January 18, 2020, before taking time off for an injury unrelated to work.  (Morgan Summ. J. Decl. [Doc. No. 46], Ex. 9 (Kerger Report) at 5–7.)  She returned to work for two weeks in March 2020, but permanently left the position in April 2020.  (*Id*. at 7.)

Defendant Ecolab is a Delaware corporation with its principal place of business in St. Paul, Minnesota. The "Doe Defendants" are manufacturers, suppliers, distributors, trademark owners, or re-packagers of chemical products and related equipment to which Plaintiff was exposed. (Compl. [Doc. No. 1] ¶¶ 11–13.) Because Hernandez alleges that the Doe Defendants were acting as the agents, employees, co-conspirators and/or alter egos of their co-defendants, (*id.* ¶ 14), the Court refers to Ecolab and the Doe Defendants collectively as "Defendants" or simply as "Ecolab."

Among the cleaning and hygiene products that Ecolab develops, manufactures, and sells is OxyCide, a surface disinfectant used in hospital and healthcare settings to reduce the risk of dangerous infections of the bacterium *Clostridium difficile*. (Morgan Summ. J. Decl., Ex. 1 (Carbone Dep.) at 41–49.) One of the chemical components of OxyCide is peroxyacetic acid ("PAA"), which is combined in a solution with hydrogen peroxide and acetic acid to form Ecolab's cleaning product. (*Id.* at 54:1-55:24.) Ecolab sells OxyCide in concentrated form, along with a proprietary closed-loop dispensing system. (*Id.* at 71:9-:12.) The dispenser is designed to prevent workers from coming in contact with the concentrated product due to the strength of its chemical components. (*Id.* at 74:22-75:5.) Prior to cleaning with OxyCide, hospital workers use the dispensing equipment to dilute the concentrated OxyCide with water. (*Id.* at 94:3-:8.) In January 2012, the EPA approved Ecolab's registration of the concentrated and diluted forms of OxyCide and stated that "[a]fter product has been diluted according to label directions PPE [personal protective equipment] is not required." (Morgan Summ. J. Decl., Ex. 7 (Reg. Notice) at ECOSLAMER000007.019; *see also id.*, Ex. 8 (Dilution Label) at

3

ECOSLAMER000007.019.)   Ecolab brought OxyCide to market in September 2013. (Carbone Dep. at 251.)

Under federal law, chemical manufacturers and distributors are required to provide product users with a Safety Data Sheet ("SDS") for each of the hazardous chemicals they produce.  29 C.F.R. 1910.1200(g).  The purpose of an SDS is to communicate information about hazardous chemicals to employers and employees who work with chemical products. *Id*.  Ecolab's May 7, 2019 SDS for OxyCide, which appears to be the operative SDS during the relevant period, provided detailed instructions for use, handling, disposal, first aid, clean-up, and fire-fighting, as well as information about the potential health effects and symptoms associated with human exposure.  (Morgan Summ. J. Reply Decl. [Doc. No. 59], Ex. 20 (May 2019 SDS) at 1–12.)  Most relevant here are the sections concerning safety measures, potential health effects from exposure, and exposure levels for each of OxyCide's three components.   Throughout the SDS, Ecolab distinguishes between OxyCide "AS SOLD" versus "AT USE DILUTION."  (*See, e.g.*, *id*. at 5–6.)  As to OxyCide's ingredients for which there are "workplace control parameters" for human exposure, the SDS provides that PAA has a "[p]ermissible [air] concentration" of 0.4 ppm for short-term exposure, according to the American Conference of Governmental Industrial Hygienists ("ACGIH").  (*Id*. at 5.)

Regarding whether workers using OxyCide should wear PPE, the SDS states, "No personal respiratory protective equipment [is] normally required" for the use of diluted OxyCide.  (*Id*. at 6.)  Addressing "Potential Health Effects," the SDS provides that for diluted OxyCide, possible injuries from inhalation are "not known or expected under

4

normal use." (*Id.* at 7–8.)  Under a section describing "[e]xperience with human exposure," the SDS states that "[n]o symptoms are known or expected" from the inhalation of diluted OxyCide.  Finally, at the end of the SDS, Ecolab issues the following disclaimer:

> The information provided in this Material Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification.  The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.

(*Id.* at 12.)

In October 2019, Hernandez received training from Pomona Valley Hospital on the use of OxyCide, which the hospital used to clean patient rooms and other areas. (Hernandez Dep. at 31.)  During training, Hernandez recalls reviewing portions of Ecolab's OxyCide SDS, although "[n]ot thoroughly," and she cannot recall the specific parts that she read.  (*Id.* at 209:21-210:5.)  Her primary takeaway from the SDS was "to be really cautious while handling [OxyCide]."  (*Id.* at 210:4-:8.)

During her employment at the hospital, Hernandez worked eight-hour shifts, five days a week.  (*Id.* at 33:20-:24.)  On her shifts, she used the OxyCide dispensing machine to prepare OxyCide, which she then dispensed into bottles and buckets.  (*Id.* at 32:20-:21.) Hernandez applied the solution to cleaning cloths, using approximately eight to ten cloths per patient room.  (*Id.* at 32:24-33:5.)  Hernandez also cleaned bathrooms, public areas, the ICU, emergency room, kitchen, and other areas.  (*Id.* at 34:3-:5.)  In addition to using

cleaning cloths containing absorbed OxyCide, Hernandez used the product on mop cloths and in buckets to clean hospital floors.  (*Id*. at 35:9-:11.)

After she began to use OxyCide, Hernandez contends that she suffered from asthma-like symptoms, difficult breathing, a burning throat, and lung irritation.  (*Id*. at 42:15-23, 145:22-25, 217:2-218:13.)   To treat these symptoms, Hernandez used an inhaler and nebulizer on a daily basis.  (*Id*. at 44:8-23.)  In contrast to her experience with OxyCide, Hernandez has not experienced an asthma attack when cleaning at home with her preferred brand of cleaning products, Mrs. Meyer's Clean Day.  (*Id*. at 60:2-4.)  Hernandez testified that she complained almost daily about OxyCide to the hospital's EVS lead workers ("the EVS leads"), but felt discouraged from reporting her concerns to their mutual supervisor.  (*Id*. at 212:5-213:1-:24.)  Hernandez did not complain to the EVS leads about any chemical products other than OxyCide.  (*Id*. at 212:20-213:24.)  Because she was relatively new to the EVS position and still on "probation," Hernandez explained that she did not complain about using OxyCide to higher-level management for fear of losing her job.  (*Id*. at 214:4-:14.)  She was aware that at least once or twice a week, other EVS workers complained about working with OxyCide.  (*Id*. at 156:4-158:7.)  Hernandez did not seek medical treatment between October 1, 2020 and January 18, 2020 for concerns related to her exposure to OxyCide.  (*Id*. at 254:9-255:8.)

Near the end of October 2019, Hernandez began further diluting the diluted OxyCide solution by 50% with water because "the product was really irritating for my lungs."  (*Id*. at 145:22-146:21.)  She explained, "I felt that, if I used the full force of the product, it was harmful to me because I could see the fumes coming out of the bottle.  So

I would pour—I would dilute it by half." (*Id*. at 146:18-21.)  She did not inform anyone at the hospital that she was diluting the product for fear of getting in trouble.  (*Id*. at 150:18-:24.)  However, even after diluting the OxyCide solution, Hernandez found it to be "pretty strong."  (*Id*. at 151:3-:4.)

In November 2019, Hernandez suffered an asthma attack while cleaning an ICU room with OxyCide.  (*Id*. at 160:7-166:10.)   She discontinued cleaning and treated herself with her inhaler.  (*See id*. at 165:2-:13.)  Three nurses summoned Hernandez's EVS lead, who checked on Hernandez after she had used her inhaler.  (*Id*. at 162:2-:9.)  Hernandez told the EVS lead what had happened and then reported, "I'm okay now."  (*Id*. at 162:3.)  Because Hernandez had her inhaler, she did not seek medical treatment on this occasion.  (*Id*. at 42:21-:25.)

By April 2020, Hernandez felt unable to work at Pomona Valley Hospital because of her worsening asthma due to OxyCide exposure and her fear of COVID-19 exposure.  (*Id*. at 42:5-:10.)

On August 19, 2020, Hernandez filed this lawsuit against Ecolab, with subject matter jurisdiction based on diversity of citizenship.  (Compl. ¶ 15.)  She asserts state law claims for strict liability based on design defect, manufacturing defect, and failure to warn, as well as negligence, breach of express warranty, breach of implied warranty, intentional misrepresentation, negligent misrepresentation, and fraudulent concealment.  (*Id*. ¶¶ 84–195.)

### B.     Procedural Background

Hernandez's lawsuit is one of several filed by individual plaintiffs in this District alleging similar claims against Defendants, based on exposure to OxyCide.  The cases were consolidated for pretrial purposes, with designated plaintiffs serving as bellwether lead plaintiffs.  Currently, *Reich v. Ecolab*, 20-cv-1172 (SRN/ECW), is the lead case for purposes of common pretrial filings.

Per the August 3, 2020 Pretrial Scheduling Order, the parties were limited to ten "common liability experts," with plaintiff-specific expert disclosures to follow.  (Morgan Exclude Decl. [Doc. No. 30], Ex. 4 (Pretrial Order No. 3).)  In January 2022, the Court initially designated Plaintiffs Kathleen Sigler and Shannon Cox as bellwether plaintiffs. (*Id.*, Ex. 5 (Corrected Pretrial Order No. 5).)  Plaintiffs' expert disclosures were due on January 11, 2022, (*id.*, Ex. 6  (Pretrial Order No. 11) ¶ 2(b)), and were to include all common liability experts for all Plaintiffs, as well as Plaintiff-specific experts for the two initially-designated bellwether cases.  Subsequently, the Court extended the deadline to February 26, 2022, and Plaintiffs disclosed several common liability experts within the deadline.  (*Id.*, Ex. 7 (Pl.'s Expert Disclosures) at 1–3).)

Plaintiffs did not disclose a general causation expert (*see id.*) and later confirmed their understanding that the deadline for disclosing such an expert had expired.  (*Id.*, Ex. 10 (*Cole v. Ecolab*, 20-cv-892 (SRN/ECW), July 1, 2022 Letter) ¶ 5(a); *Id.*, Ex. 11 (*Cole*, July 7, 2022 Tr.) at 18:16-19:8.)  In May 2022, Ecolab moved for summary judgment against former bellwether plaintiffs Sigler and Cox on several grounds, including causation.  (*Id.*, Exs. 12 (Defs.' *Cox* Summ. J. Mem) & (Defs.' *Sigler* Summ. J. Mem.)

8

However, it was unnecessary for the Court to reach these arguments because it dismissed Sigler's case on statute of limitations grounds and Cox voluntarily dismissed her case. (*Id.*, Exs. 14 (Sept. 1, 2022 *Sigler* Order) & 15 (Aug. 11, 2022 *Cox* Am. J.).) Hernandez was then selected as a bellwether plaintiff for trial in January 2023. (*Id.*, Ex. 9 (Pretrial Order No. 17) at 1.)

At the same time that Ecolab moved for summary judgment against Sigler and Cox, it also moved to exclude, in whole or in part, Plaintiffs' common liability retained experts, Dr. Mark Nicas, Dr. Stephen Wilcox, Mr. William Jordan, Dr. Gurumurthy Ramachandran, and Dr. Edward Zellers. The Court denied almost all of Ecolab's motions, excluding only Dr. Ramachandran's testimony in full, and indicated that the ruling applied to all of the consolidated cases in the same group as the lead plaintiff, including *Hernandez*. (*Cole*, No. 20-cv-892, Mar. 6, 2023 Order [Doc. No. 312] at 1 n.1; Mar. 23, 2023 Order [Doc. No. 314] at 1 n.1; *Reich*, 20-cv-1172, Consolidation Order [Doc. No. 13], App. A.)

Plaintiffs retained Dr. Robert Harrison in early July 2022 to offer expert opinions on both general causation and specific causation in *Hernandez*. (Morgan Exclude Decl., Ex. 3 (Harrison *Slamer* Dep.) at 49:2-:19, 50:6-:23.) On July 15, 2022, the Court ordered that Hernandez's remaining plaintiff-specific expert disclosures and accompanying expert reports were due on August 2, 2022. (*Id.*, Ex. 9 (Pretrial Order No. 17) at 1.

In Hernandez's August 2, 2022 disclosures, she disclosed Dr. Harrison, as well as Drs. Nicas, Wilcox, Ramachandran, and Zellers, and Mr. Jordan, as her bellwether plaintiff-specific retained experts. (*Id.*, Ex. 16 (Pl.'s Aug. 2022 Disclosures) at 1–5.) As to Dr. Harrison, Plaintiff stated that his anticipated testimony would address

whether OxyCide is toxic; whether OxyCide is unreasonably dangerous when used as intended or as reasonably foreseeable; whether OxyCide was a substantial factor in causing Plaintiff's injuries; the maximum levels of exposure before OxyCide becomes unreasonably dangerous to Plaintiff; and Plaintiff's chemical exposure to OxyCide and effects on her physiology.

(*Id.* at 4.)

In formulating the opinion in his July 29, 2022 initial expert report (the "Initial Report"), Dr. Harrison reviewed numerous materials, including medical and scientific literature that he identifies, the Complaint, Plaintiff's Fact Sheet, Plaintiff's discovery responses, medical records, employment records, the deposition transcripts of Plaintiff and Ecolab employees, and Ecolab's documents. (Vercoski Exclude Decl. [Doc. No. 34] , Ex. 3 (Harrison Report) at 10, App. B.) Dr. Harrison asserts that "[t]he medical literature indicates OxyCide is a sensitizing asthmagen and exposure to its vapors can cause both new onset occupation asthma and work-aggravated asthma[.]" (Harrison Report at 11.) He opines that exposure to OxyCide during routine cleaning duties for workers with preexisting asthma can and does aggravate their respiratory conditions. (*Id.* at 10.) He further states that "[t]he exposure to OxyCide vapors can result in either a specific injury, cumulative effects of repeated exposures, or both." (*Id.*) Dr. Harrison finds it "plausible that any worker who has relevant symptoms [] of a pre-existing condition while working with OxyCide has experienced that aggravation because of the exposure to OxyCide." (*Id.*) As to Ms. Hernandez, he opines:

Ms. Hernandez has reported in discovery responses that she has had asthma since childhood; worked 5-days a week for approximately three months with daily workplace exposure to OxyCide; the onset of symptoms was close in time to an exposure to OxyCide vapor; and experienced an acute asthma reaction resulting in seeking medical care approximately two months after

10

> she beg[a]n working with OxyCide. These facts are consistent with Ms.
> Hernandez['s] claimed aggravation of her pre-existing asthma from exposure
> to OxyCide.

(*Id.* at 12.)  Finally, Dr. Harrison notes that his opinions are based on the assumption that

Hernandez provided accurate information in her discovery responses. (*Id.*)

Ecolab objected to Dr. Harrison's general causation opinion as untimely, arguing

that it missed the disclosure deadline by over five months. (Defs.' Aug. 9, 2022 Letter

[Doc. No. 12].)  At a status conference on the matter, Plaintiff's counsel advised that it had

difficulty scheduling Dr. Harrison's examination of Hernandez and anticipated that Dr.

Harrison would file a supplemental report after meeting with Plaintiff. (Aug. 29, 2022

Status Conf. Tr. [Doc. No. 20] at 9:16-:23.)  The Court directed Ecolab to file a formal

motion when it deemed appropriate to challenge the late disclosure of Dr. Harrison's

opinion. (*Id.* at 14:22–15:12.)  Although Plaintiff's counsel had originally scheduled

Hernandez's examination with Dr. Harrison on September 9, 2022, Hernandez canceled

the examination due to an unforeseen family emergency. (Hernandez Decl. [Doc. No. 35]

¶¶ 1–2.)  Hernandez rescheduled her examination with Dr. Harrison to October 4, 2022,

for a one-hour meeting via Zoom. (Vercoski Exclude Decl., Ex. 11 (Oct. 4, 2022 Email).)

Hernandez produced Dr. Harrison's Supplemental Report on January 12, 2023. Dr.

Harrison prefaces the Supplemental Report by noting that while his Initial Report addresses

general causation, the focus of his Supplemental Report is specific causation. (*Id.*, Ex. 12

(Harrison Suppl. Report) at 3–4.)  To prepare his Supplemental Report, Dr. Harrison relied

on many of the same materials as for his Initial Report, but also on his examination of

Hernandez. (*Id.* at 10.)  In the Supplemental Report, Dr. Harrison offers his opinions "to a

reasonable degree of medical certainty." (*Id*. at 13.)  He opines that based on Hernandez's written job duties and her description of her tasks, "[I]t is likely that Ms. Hernandez inhaled OxyCide into her lungs." (*Id*. at 12.)  Dr. Harrison notes that as he discussed in his Initial Report, "[T]he medical and scientific literature shows that OxyCide is a sensitizing asthmagen and exposure to its vapors can cause both new onset occupational asthma and work-aggravated asthma (general causation)." (*Id*.; *see also* Harrison Report at 11.)

As to Hernandez specifically, Dr. Harrison notes her worsening respiratory problems in November 2019 while using OxyCide.  (Harrison Suppl. Report at 12.)  While Hernandez described episodes of throat burning and chest tightness as "asthma attacks," Dr. Harrison opines that these episodes "were probably exacerbations of [Hernandez's] underlying asthma." (*Id*.)  Further, Dr. Harrison opines that "[i]t is likely that Ms. Hernandez suffered work-aggravated asthma caused by exposure to OxyCide.  Given her prior history of asthma, this probably occurred due to the irritative (rather than sensitizing) effect of OxyCide on Ms. Hernandez's airways." (*Id*.)   In terms of future employment, Dr. Harrison asserts that Hernandez "is precluded from work that involves exposure to airborne chemicals, dusts or fumes that will exacerbate her asthma." (*Id*. at 12–13.)  In addition, he opines that Hernandez requires medical treatment for her asthma, specifically in the form of inhaled bronchodilators and the potential use of inhaled corticosteroids. (*Id*. at 13.)

### C.    Parties' Positions

#### 1.    Motion to Exclude

Procedurally, Ecolab argues that Hernandez's late disclosure was unjustified and prejudicial to Ecolab, and the Court should exclude his opinions on this basis.  (Defs.' Mem. to Exclude [Doc. No. 29] at 19–23; Defs.' Reply to Exclude [Doc. No. 36] at 2.) Substantively, Ecolab also moves to exclude Dr. Harrison's opinions, arguing that they fail to satisfy the requirements for expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).  (Defs.' Mem. to Exclude at 23–29.)

Hernandez opposes Ecolab's Motion to Exclude, asserting that she timely disclosed Dr. Harrison's opinions, and in any event, Ecolab has not been prejudiced because "Ecolab knows Dr. Harrison's methodology and opinions from depositions taken outside of this case[.]" (Pl.'s Opp'n to Exclude [Doc. No. 33] at 17.)  Hernandez also observes that Ecolab had not yet taken Dr. Harrison's deposition in this case when it filed the Motion to Exclude his testimony—a motion that Hernandez characterizes as a premature *Daubert* motion.  (*Id*. at 22.)  As to the substance of Dr. Harrison's opinions, Hernandez contends that they satisfy the requirements of *Daubert*.  (*Id*. at 23.)

#### 2.    Summary Judgment

Consistent with its Motion to Exclude, Ecolab moves for summary judgment, asserting that Hernandez's claims fail as a matter of law because she cannot establish causation.  (Defs.' Summ. J. Mem. [Doc. No. 45] at 22–29.)  Ecolab further contends that Plaintiff's claims fail as a matter of law for the following additional reasons:  (1) the manufacturing defect claim fails because OxyCide did not deviate from the applicable

standards or specifications; (2) Hernandez should voluntarily dismiss her express and implied warranty claims, just as the plaintiff did in *Slamer v. Ecolab*, Civil No. 1709131 (Cal. Super. Ct., San Bernardino Cnty.), where counsel on both sides were the same as in the instant matter; (3) Plaintiff's warranty-based claims are not supported by the facts; (4) Plaintiff's fraudulent concealment and misrepresentation claims fail because she has not identified any statements made by Ecolab on which she justifiably relied; and (5) Plaintiff has not identified any Ecolab corporate officer who made a representation to Hernandez specifically about OxyCide's safety. (*Id*. at 30–38.)

Hernandez opposes Ecolab's motion in nearly all respects. However, she does not oppose summary judgment as to her manufacturing defect claim. (*See* Pl.'s Summ. J. Opp'n [Doc. No. 50] at 31.) Accordingly, the Court grants in part Ecolab's Motion for Summary Judgment on Plaintiff's strict liability claim based on manufacturing defect and dismisses with prejudice Count II of the Complaint. With respect to her other claims, Hernandez contends that she has sufficiently established triable issues of fact as to causation, express and implied warranty, and fraudulent concealment and misrepresentation. (*Id*. at 23–39.)

## II.   DISCUSSION

### A.   Motion to Exclude

#### 1.   Untimely Disclosures

Rule 16 permits the district court to impose sanctions on a party for failing to meet a deadline. *Firefighters' Inst. for Racial Equal. v. City of St. Louis*, 220 F.3d 898, 902 (8th Cir. 2000); *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1144 (D. Minn.

2003).  When a party fails to meet an expert disclosure deadline, Rule 16 is buttressed by the sanctions imposed by Rule 37(c)(1).  *N. Star Mut. Ins. Co*., 269 F. Supp. 2d at 1145. Rule 37(c)(1) permits the Court to exclude the untimely report and testimony "unless the failure to disclose was either harmless or substantially justified."  *Trost v. Trek Bicycle Corp*., 162 F.3d 1004, 1008 (8th Cir. 1998); *see also* Fed. R. Civ. P. 37(c)(1); *Transclean Corp. v. Bridgewood Servs., Inc*., 77 F. Supp. 2d 1045, 1064 (D. Minn. 1999) (Erickson, Mag. J.) ("While sanctions under Rule 37(c)(1) are mandatory . . . exclusion of evidence should not apply if the offending party's failure was substantially justified, or if the failure was harmless.") (citation omitted), *aff'd in part, vacated in part on other grounds*, 290 F.3d 1364 (Fed. Cir. 2002).

In determining whether the exclusion provisions of Rule 37 should apply, the Court considers four factors: (1) the importance of the excluded material; (2) the explanation of the party for failure to comply with the disclosure; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice. *See Neupak, Inc. v. Ideal Mfg. & Sales Corp*., 168 F.Supp.2d 1012, 1016 (D. Minn. 2001) (Erickson, Mag. J.) (citing *Citizens Bank v. Ford Motor Co*., 16 F.3d 965, 966 (8th Cir. 1994)).

There is no question that Hernandez failed to timely disclose Dr. Harrison's opinions.  His general causation opinion should have been disclosed on February 26, 2022, but Plaintiff disclosed it more than five months later, on July 29, 2022.  Moreover, while Hernandez identified Dr. Harrison as a plaintiff-specific expert witness consistent with the plaintiff-specific disclosure deadline of August 2, 2022, she did not produce Dr. Harrison's

Supplemental Report until five months later, yet again, on January 12, 2023. Hernandez fails to offer an acceptable explanation for her untimeliness, asserting that her counsel believed a separate disclosure schedule for general causation experts applied in cases in which the plaintiff had a preexisting condition. (Morgan Exclude Decl., Ex. 1 (Aug. 29, 2022 Status Conf. Tr.) at 4:23-5:14.)   No such separate schedule exists, and as Ecolab observes, prior bellwether plaintiffs Cox and Sigler had preexisting conditions and no separate plaintiff-specific expert disclosure deadlines applied to them. (Defs.' Reply to Exclude at 1–2.) As further explanation for the lapse of time, Plaintiff notes that this matter was temporarily stayed to permit her to consider voluntary dismissal in light of the Court's decision in a related matter. (*See* Vercoski Exclude Decl., Ex. 7 (Sept. 6, 2022 Minute Order).)   Plaintiff also points to difficulties in scheduling Dr. Harrison's virtual examination of Hernandez, and further notes that in his Initial Report, Dr. Harrison "reserved the right to supplement" his opinion. (Pl.'s Opp'n to Exclude at 15–16.)

The Court is unpersuaded that any of these reasons substantially justified Hernandez's late disclosure of Dr. Harrison's opinions. This conduct is concerning, and the Court orders Plaintiff's counsel to strictly adhere to all rules and deadlines going forward.

While the Court does not condone Plaintiff's conduct, other factors weigh in favor of not excluding Dr. Harrison as an expert witness. His testimony is highly important because he addresses a key issue—causation. As the Court will discuss in greater detail below, Hernandez must establish causation for all of her claims, and for claims involving personal injury, both general and specific causation must be established by expert

testimony.  *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 968 (D. Minn. 2009)

("Plaintiffs must show both general and specific causation by expert testimony"); *Jones v.*

*Ortho Pharm. Corp.*, 209 Cal Rptr. 456, 460 (Cal. Ct. App. 1985) ("The law is well settled

that in a personal injury action causation must be proven within a reasonable medical

probability based upon competent expert testimony.").

In addition, the Court finds that Ecolab is not sufficiently prejudiced or harmed by

the untimely submissions of the Harrison reports to justify striking him as an expert.  *See*

*Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-cv-820 (ADM/JSM), 2015

WL 7760165, at *3 (D. Minn. Dec. 2, 2015) (declining to exclude expert's untimely

opinion because there was no harm to defendant, who was permitted to address and rebut

the proffered opinions).  Shortly after Ecolab filed its Motion to Exclude, Plaintiff produced

Dr. Harrison's Supplemental Report.  To the extent Ecolab finds inconsistencies between

the reports, it can explore them in a deposition, and on cross examination.  *See C.H.*

*Robinson Co. v. Zurich Am. Ins. Co.*, No. 02-cv-4794 (PAM/RLE), 2004 WL 1765320, at

*2 (D. Minn. Aug. 5, 2004) (declining to strike expert report where testimony was

important and defendant not prejudiced because it could depose the expert witness).  In

addition, as Hernandez notes, Ecolab is well familiar with Dr. Harrison's general causation

opinions and testimony based on prior depositions in other cases, including his testimony

in the recent *Slamer* trial in California state court.  Finally, at the time Ecolab filed its

Motion to Exclude, it faced a May 23 trial date, and was simultaneously engaged in the

California state court trial in *Slamer*.[2]   The trial in the instant matter has since been rescheduled and will start on September 5, 2023, which gives Ecolab sufficient time to depose Dr. Harrison before trial.[3]   (Trial Notice [Doc. No. 57].)   The parties will have a full opportunity to file pretrial evidentiary motions in advance of trial.

In its discretion, the Court finds that on balance, consideration of the relevant factors does not support the exclusion of Dr. Harrison's testimony.

### 2.   *Daubert* Standards

Ecolab also moves to exclude Dr. Harrison's opinions on the grounds that they do not meet the requirements of Federal Rule of Evidence 702 and *Daubert*, 509 U.S. at 592–97.   Specifically, Ecolab argues that Dr. Harrison: (1) fails to recognize the importance of Hernandez's medical history, preexisting conditions, and social habits; (2) fails to provide an admissible differential diagnosis; (3) fails to follow his own standard methodology; (4) fails to quantify Hernandez's exposure to OxyCide; and (5) that his opinion lacks adequate factual support and data in the form of medical and pharmacy records.   (Defs.' Mem. to Exclude at 23–27; Defs.' Reply to Exclude at 5, 10–16.)

Whether expert testimony should be admitted or excluded is a matter of federal, rather than state, law.   *Shipp v. Murphy*, 9 F.4th 694, 701 (8th Cir. 2021) (citing *Fox v.*

---

[2] After three months of trial in *Slamer*, the parties ultimately resolved the matter in April 2023 by a confidential settlement agreement.   *See Reich v. Ecolab*, 20-cv-1172 (SRN/ECW), May 1, 2023 Letter [Doc. No. 33].)

[3] At the hearing on the Motion to Exclude, the Court offered defense counsel the opportunity to depose Dr. Harrison at that time, which defense counsel declined.

*Dannenberg*, 906 F.2d 1253, 1255 (8th Cir. 1990)).   Under Rule 702, proposed expert testimony must satisfy three prerequisites in order to be admissible.  *Lauzon v. Senco Prods., Inc*., 270 F.3d 681, 686 (8th Cir. 2001).   "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id*. (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact." *Id*. (citation omitted).  "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id*. (citation omitted) (internal quotation marks omitted).

These requirements reflect the Supreme Court's analysis in *Daubert*, in which the Court emphasized the district court's gatekeeping obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable."  509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to technical and other specialized expert testimony).  Pursuant to *Daubert*, the cornerstone for admissibility is assistance to the trier of fact.  *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005).

Under this standard, proponents must demonstrate by a preponderance of evidence that the expert's opinion is reliable.  Courts generally support "an attempt to liberalize the rules governing the admission of expert testimony," and favor admissibility over exclusion. *See Lauzon*, 270 F.3d at 686 (citation omitted) (internal quotation marks omitted); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of the testimony and not its admissibility. *Robinson v. GEICO Gen. Ins. Co*., 447 F.3d 1096, 1100 (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

### a.    Expertise

Although asserted in support of its summary judgment motion, but more relevant to Ecolab's Motion to Exclude, Ecolab argues that Dr. Harrison is not qualified to offer his opinions, as he is neither a board certified toxicologist, nor a board certified pulmonologist. (Defs.' Summ. J. Reply [Doc. No. 58] at 15.)   While Ecolab acknowledges that expert opinions are not solely limited to the expert's area of expertise, it argues that Dr. Harrison's opinions stray from his area of expertise and are entitled to less weight.   (*Id*.) (citing *Williams v. Pro-Tec, Inc*., 908 F.2d 345, 348 (8th Cir. 1990)).   By contrast, Ecolab contends that its experts, Drs. Pamela Dalton, James Lineback, and Brent Kerger, possess the proper credentials in toxicology and pulmonology.   (*Id*.)

Dr. Harrison is board-certified in occupational medication and internal medicine. (Harrison Report at 2.)   He is a Clinical Professor of Medicine at the University of California, San Francisco, and Chief of the Occupational Health Surveillance and Evaluation Program at the California Department of Health.   (*Id*., App. A.)   Dr. Harrison has written or co-authored numerous peer-reviewed publications concerning occupational health issues and has served as an expert witness in over 40 legal matters, including, most

recently, the *Slamer* trial, which involved workplace exposure to OxyCide in a hospital setting. (Harrison Report at 2–4.) His expertise in occupational medicine is particularly relevant here, as Plaintiff alleges her exposure to OxyCide occurred in her former workplace. Not only has Dr. Harrison treated more than 10,000 patients with work-related and environmentally induced diseases or injuries, his patients have included multiple healthcare workers who have developed occupational asthma after using OxyCide. (*Id*. at 2.) In formulating his opinions here, he reviewed specific medical literature and scientific literature. (*Id*. at 6–7.)

Given Dr. Harrison's extensive background in matters involving occupational exposure injuries, including OxyCide, the Court finds that his testimony will be helpful to the jury. The Court declines to exclude Dr. Harrison based on his lack of expertise as a toxicologist or pulmonologist. At trial, he will explain the bases for his opinions, Ecolab will have the opportunity to challenge them, and the jury can assess the weight of his testimony.

### b.    Methodology

Ecolab argues that Dr. Harrison's opinions must be excluded because they are speculative and unsupported. (Defs.' Reply to Exclude at 3–4.) Ecolab contends that because Dr. Harrison fails to provide his methodology, his reasoning cannot be tested or reproduced by another expert or scientist. (*Id*. at 3–4, 10–13.) In addition, Ecolab argues that Dr. Harrison fails to follow his own methodology, about which he has testified in other lawsuits against Ecolab. (Defs.' Mem. to Exclude at 9–12; 26–27.)

The Court will not exclude Dr. Harrison's testimony on these grounds.  Again, Dr. Harrison reviewed Hernandez's medical records, employment information, discovery documents, and relevant scientific literature, and he met with Hernandez via Zoom to discuss her medical issues.  (Harrison Suppl. Report at 5–10.)  Combined with Dr. Harrison's education and years of experience treating patients for occupational chemical exposures, including patients who have been exposed to OxyCide, his methodology is sufficiently reliable and relevant.  Neither *Daubert* nor Rule 702 require that every expert opinion be supported by testing that is subject to reproduction.  *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829 (8th Cir. 2019) (noting that expert was not required to conduct physical testing, and was qualified to provide expert testimony); *Schober v. Coleman Co., Inc.*, No. 08-cv-5993 (PJS/SRN), 2010 WL 1286180, at *4 (D. Minn. Mar. 29, 2010) ("Testing is certainly not an absolute requirement.")  To the extent that Dr. Harrison's methodology differs in any respect from his past methodology in other cases— for example, Ecolab notes that Dr. Harrison typically conducts in-person examinations and uses a survey form (Defs.' Mem. to Exclude at 10; Defs.' Reply to Exclude at 4)—Ecolab will have the opportunity to cross examine him about any such differences.  However, his methodology is sufficiently reliable to satisfy *Daubert*.

Nor does the Court find Dr. Harrison's resulting opinions speculative.  As noted, his opinions are based on specific sources of information, including peer-reviewed scientific literature, Hernandez's medical records, and his interview of Hernandez.  Therefore, the Court also declines to exclude Dr. Harrison's opinions on the ground that they are

speculative.  Ecolab will be free to challenge Dr. Harrison's opinions through cross examination and the presentation of its own witnesses and exhibits

### c.  Recognition of Other Medical Conditions and Differential Diagnosis

As noted, Ecolab argues that Dr. Harrison fails to properly recognize Hernandez's other medical conditions and social habits, rendering his specific causation opinions insufficiently supported by the facts and unreliable.  (Defs.' Reply to Exclude at 10–11.)  In particular, Ecolab argues that Dr. Harrison's opinions fail to recognize the importance of Hernandez's BMI, GERD, and marijuana use as possible causes of her worsening breathing problems.  (*Id*. at 4–6, 1–11.)

A differential diagnosis is one technique for establishing specific causation by eliminating the likely causes of a medical condition until the most probable cause remains. *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000); *see also Pilliod v. Monsanto Co.*, 282 Cal. Rptr. 3d 679, 695 n.8 (Cal. Ct. App. 2021) (noting that a differential diagnosis, or differential etiology, "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated."), *reh'g denied* (Aug. 25, 2021), *review denied* (Nov. 17, 2021), *cert. denied*, 142 S. Ct. 2870 (2022) (citation omitted).  The Eighth Circuit has held that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*."  *Turner*, 229 F.3d at 1208.

Here, Dr. Harrison found that Hernandez has no history of medical treatment resulting from exposure to any other chemical products.  (Harrison Report at 10.)  He noted

her "unchanged" weight, her March 2022 treatment for acid reflux, and her history of asthma. (Harrison Suppl. Report at 6, 11.) These notations reflect his recognition of these conditions. Dr. Harrison also considered Hernandez's deposition testimony in which she stated that her respiratory symptoms became worse after her exposure to OxyCide. (*Id.* at 9–10.) Dr. Harrison observed that in Hernandez's prior job at Home Depot, she carried an inhaler in case of emergencies, but "hardly ever needed it" and never brought a nebulizer to work. (*Id.*) Also, he also noted that since leaving her position at Pomona Valley Hospital, Hernandez's asthma has been much worse than it was before November 2019, and she has not worked outside the home since April 2020. (*Id.* at 11.) While Dr. Harrison does not expressly state that he eliminated Hernandez's BMI, GERD, or medicinal marijuana use as other possible causes of her worsening asthma, his opinions can support an inference to that effect. For example, if Hernandez's weight was "unchanged," the status of her weight likely predated her exposure to OxyCide and had little to no impact in causing her breathing problems.

The Court declines to exclude Dr. Harrison's testimony on the basis of a lack of differential diagnosis or consideration of other possible causes of Hernandez's injuries. His opinions suggest that he considered and rejected other causes and his deposition will further inform this issue. The motion to exclude Dr. Harrison on this basis is denied.

### d. Quantification of the Exposure

Ecolab also argues that the Court should exclude Dr. Harrison's testimony because he fails to quantify Hernandez's exposure, or "dose," of OxyCide. (Defs.' Reply to

Exclude at 12; Defs.' Oral Arg. Reply [Doc. No. 39] at 3–4[4].)  It contends that such quantification is particularly necessary, given Hernandez's "unique exposure history" of further diluting the OxyCide solution by 50% prior to use.  (Defs.' Reply to Exclude at 12.)

The Eighth Circuit has stated that to establish causation in a toxic tort case, "a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury." *Mattis v. Carlon Elec. Prod*s., 295 F.3d 856, 860 (8th Cir. 2002).  However, plaintiffs are not required to produce a "mathematically precise table equating levels of exposure with levels of harm." *Id*. (citation & quotation omitted).  Instead, "a plaintiff need only make a threshold showing that he or she was exposed to toxic levels known to cause the type of injuries he or she has suffered." *Id*. at 860–61.  In other words, "[i]t is sufficient for a plaintiff to prove that she was exposed to a quantity of the toxin that 'exceeded safe levels.'" *Bonner v. ISP Techs., Inc*., 259 F.3d 924, 931 (8th Cir. 2001) (finding it unnecessary for plaintiff's experts to quantify the precise amount of exposure because "[plaintiff] presented witnesses who testified that her exposure to FoamFlush was of a duration and of a volume sufficient to support a conclusion that she inhaled and/or absorbed through her skin at least a quarter of a teaspoon of FoamFlush when she was sprayed with it.") (citing *Bednar v. Bassett Furniture Mfg. Co., Inc*., 147 F.3d 737, 740 (8th Cir. 1998)).

---

[4] Due to technical difficulties that Ecolab's counsel experience at the teleconference hearing on Ecolab's Motion to Exclude, the Court permitted Ecolab to file a short rebuttal to Plaintiff's oral argument.

Ecolab relies on *Bland v. Verizon Wireless, L.L.C.*, 538 F.3d 893, 896 (8th Cir. 2008), in which the Eighth Circuit affirmed the exclusion of an expert in a personal injury action brought by a customer who ingested freon after a store employee sprayed freon into the customer's water bottle. The expert, Dr. Sprince, opined that freon caused the customer's exercise-induced asthma. *Id*. at 896. In addition to the lack of a differential diagnosis, the court found that the expert's opinion was not supported by sufficient data, as he lacked knowledge of both the amount of freon exposure that causes, or involves an appreciable risk of causing, asthma, as well as the plaintiff's probable or actual amount of freon exposure. *Id*. The Eighth Circuit observed that the district court "suggested one way in which Dr. Sprince may have been able to buttress her opinion would be offering as evidence any personal experience with treating other patients following a similar exposure to difluoroethane, freon, or freon with difluoroethane," however "she had no such experience." *Id*. at 898.

The type of exposure here is quite different than in *Bland*. In *Bland*, the plaintiff was exposed to freon on a one-time basis and allegedly suffered an acute response. *Id*. at 895–96. There were no facts showing that repeated exposure to freon caused the plaintiff's injuries such that the sensitizing qualities of freon, if any, might be relevant or alter the analysis of exposure levels. By contrast, Hernandez bases causation on her long-term exposure to OxyCide. She submits evidence showing that the sensitizing qualities of OxyCide exacerbated her underlying asthma, just as ongoing exposure to OxyCide, even in small doses, can aggravate the respiratory condition of a worker whose exposure caused the onset of respiratory sensitivity. (Harris Suppl. Report at 3.) In addition, unlike the

expert in *Bland*, 538 F.3d at 898, Dr. Harrison can "buttress his opinion" on exposure levels by describing his significant experience examining and treating multiple healthcare workers who have developed occupational asthma after using OxyCide. (Harrison Report at 2.)

One potential method of quantifying exposure levels is through a dose-response study, in which an expert examines the correlation between dosage and the risk of harm. However, in *Slamer*, Dr. Harrison testified that the "dose response principle"—in which the greater the dose, the greater the risk of harm—is inapplicable to measuring respiratory sensitization in a product like OxyCide. (*Reich*, No. 20-cv-1172, Feb. 22, 2023 *Slamer* Rough Trial Tr. [Doc. No. 28-4] at 112:15-:21.) Again, he explained at trial that one of OxyCide's ingredients, PAA, "acts as a sensitizer" that "even at very, very low doses [it] can cause a reaction and a response." (*Id*. at 112:19–:21.) Dr. Harrison contrasted respiratory sensitization with physical irritation, stating,

> A chemical irritant just causes direct irritation to the body, the respiratory tract, the mucous membranes up in the nose and in the back of the throat, as you go down the larynx and into the lungs. And that is dependent, directly correlated with the dose, the amount of chemical in the air, and to the physical irritation of the respiratory tract.
>
> Sensitization has to do with the structure of that molecule. So peracetic acid [is] made up of different atoms that form molecules. The way that molecule is structured causes the body's immune system to react. . . . And it can happen at really, really low doses, because the molecular structure is such that it causes the body's immune system to recognize it and react. So that's a different mechanism than irritation.

(*Id*., Feb. 28, 2023 *Slamer* Rough Trial Tr. [Doc. No. 28-5] at 36:7-:21.)

27

Although Dr. Harrison has not quantified the level of Hernandez's exposure through a dose-response study, the Court finds that his opinion nonetheless meets the "threshold showing that [Hernandez] was exposed to toxic levels known to cause the type of injuries [] she has suffered," for purposes of *Daubert*. *Mattis*, 295 F.3d at 860.   Dr. Harrison addresses exposure levels by explaining the way in which a sensitizing product such as OxyCide affects the body with continued use. (Harrison Report at 11–12; Harrison Suppl. Report at 4, 12.)   He relies on peer-reviewed articles and studies and his professional knowledge of a connection between exposure to OxyCide vapors and either a specific injury, cumulative effects of repeated exposures, or both. (Harrison Suppl. Report at 3.) While Ecolab argues that the medical and scientific literature does not support Dr. Harrison's opinion that PAA is a sensitizing asthmagen, (Defs.' Summ. J. Mem. at 25–28), Dr. Harrison has clarified that the AOEC specifically lists OxyCide, which contains PAA, as a respiratory sensitizer and asthmagen. (Vercoski Summ. J. Decl. [Doc. No. 51], Ex. 42 (Feb. 22, 2023 *Slamer* Trial Tr.) at 31:3-:21.)

Dr. Harrison also relies on his clinical experience in treating patients for work-related and environmentally induced diseases or injuries, including multiple healthcare workers who developed occupational asthma after their use of OxyCide. (Harrison Report at 2; Harrison Suppl. Report at 3.)

Finally, in terms of quantifying OxyCide exposure levels, as the Court observed in its ruling on the admissibility of the Consolidated Plaintiffs' general causation experts, (*Cole*, No. 20-cv-892 [Doc. No. 312] (Mar. 6, 2023 Order) at 4, 19), there is no governmentally-determined safety standard for occupational airborne exposure to PAA in

the United States and the methods to measure airborne PAA levels are evolving.  *See Bonner*, 259 F.3d at 928 (stating that "'[t]he first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed.'")  (quoting *Turner*, 229 F.3d at 1208–09).

Again, Ecolab will have the opportunity to cross examine Dr. Harrison about the underpinnings of his opinion and to present evidence and testimony in opposition.   The Court declines to exclude his testimony based on the quantification of Plaintiff's OxyCide exposure levels.

### e.   Sufficient Records

Ecolab also argues that Dr. Harrison's opinions are not supported by sufficient medical and pharmacy records.  (*See* Defs.' Reply to Exclude at 6) ("Dr. Harrison credulously cites Plaintiff's statement that she has increased use of her inhaler, but never acknowledges that she has not been able to produce any pharmacy records showing this is actually true.").   Dr. Harrison has identified the medical records that he reviewed in formulating his opinions.  (Harrison Suppl. Report at 5–6.)  To the extent there are gaps in Hernandez's medical and pharmacy records, this appears to be due, to some extent, to obtaining an inhaler outside the United States.  (Hernandez Dep. at 237:20-238:12, 240:20-:25.)  Hernandez testified that during the COVID-19 pandemic, she made trips to her native Mexico—specifically, in August of 2020 and August, September, and November of 2021—where she met with a doctor to refill her inhaler prescription, which she obtained from a Mexican pharmacy.  (*Id.*)  The Court declines to exclude Dr. Harrison based on the

sufficiency of the medical records.  Ecolab may cross examine him about whether a gap in records affects his opinions.

In sum, for all of the foregoing reasons, the Court declines to exclude Dr. Harrison from testifying.  Accordingly, Ecolab's Motion to Exclude is denied.

### B.    Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intel., Inc*., 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### 1.  Applicable Law

Before addressing the merits of Defendants' arguments, the Court must first determine whether the law of the forum state, Minnesota, or the law of the place of injury and treatment, California, controls.  The parties contend that California law applies to all of Hernandez's claims.  (Defs.' Summ. J. Mem. at 16–20; Pl.'s Summ. J. Opp'n at 22–23.) The Court finds that although California law applies to most of Hernandez's claims, it does not apply to all of them.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012).  Minnesota's choice-of-law methodology involves the following steps: (1) determining whether the differences between each state's law result in an outcome-determinative conflict of substantive law; (2) if a conflict exists, determining whether it is constitutionally permissible to apply each state's law to the case; and (3) deciding which state's law is favored, after considering a multifactored test commonly referred to as "Leflar's five choice-influencing factors."[5]  *Blake Marine Grp. v. CarVal Invs. LLC*, 829 F.3d 592, 596 (8th Cir. 2016) (citing *Whitney*, 700 F.3d at 1123–24).  An outcome-determinative conflict is one in which "the choice of one forum's law over the

---

[5] The factors are named for Professor Robert Leflar, who identified this framework for resolving conflicts of law.  William M. Richman and William L. Reynolds, *Understanding Conflicts of Laws* § 78 (2d ed. 1993).

other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000).

### a.    Choice of Law Analysis

As a general matter, if a conflict of law is procedural, the law of the forum state is applied. *Chen v. Target Corp.*, No. 21-cv-1247 (DWF/DTS), 2022 WL 1597417, at *5 (D. Minn. May 19, 2022) (citing *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir. 1995)). However, if a conflict of law is substantive, the choice-of-law analysis proceeds. *Id*. A substantive law "creates, defines, and regulates rights," while a procedural law prescribes the method of enforcing rights or obtaining redress. *Id*. (citing *Zaretsky v. Molecular Biosys., Inc.*, 464 N.W.2d 546, 548 (Minn. Ct. App. 1990)).

Ecolab  maintains that California law applies because the laws of Minnesota and California present an actual, substantive conflict that is outcome determinative "regarding the substantive remedies that are available to plaintiffs in product liability cases"—specifically, differences in comparative fault. (Defs.' Summ. J. Mem. at 17.)  Plaintiff agrees that California law should apply, consistent with this Court's ruling in *Sigler v. Ecolab*, ___ F. Supp.3d ___, No. 20-cv-1389 (SRN/ECW), 2022 WL 4000390, at *14–15 (D. Minn. Sept. 1, 2022), where the choice-of-law analysis resolved in favor of the law of the plaintiff's state of residence, exposure, and place of treatment. (Pl.'s Summ. J. Opp'n at 23–24.)

Under Minnesota law, "a choice-of-law determination is made on an issue-by-issue, and not case-by-case, basis." *Brenner v. Nat'l Outdoor Leadership Sch.*, 20 F. Supp. 3d

709, 714 (D. Minn. 2014) (citing *Zaretsky*, 464 N.W.2d at 548).  Accordingly, the Court

must examine Hernandez's claims and related issues to determine whether a conflict exists.

This analysis slightly differs from the Court's approach in *Sigler*, in which the

conflict was between two states' statute of limitations—a conflict that applied to *all* of the

plaintiff's claims.  *Sigler*, 2022 WL 4000390, at *5–6.  Applying the choice-of-law analysis

to the conflicting limitations periods in *Sigler*, the Court considered the Leflar factors with

reference to issues inherent in the underlying claims.  *Id.* at *6 (citing *Blake Marine*, 829

F.3d at 596).  For example, the Court considered the two states' competing policy interests

implicated in setting deadlines for the underlying claims—policy interests that might differ

depending on whether the underlying claim sounded in tort or contract law.  *Id.* at *7–14;

*see also Blake Marine*, 829 F.3d at 596 (addressing issues inherent in tortious interference

claim by comparing the states' competing interests in compensating resident and non-

resident tort victims).   In contrast to Hernandez's timely-filed claims here, the Court

explained in *Sigler*, "[T]his case does not involve breach of warranty claims that were

timely filed under both Oregon and Minnesota law, in which case the privity requirements,

or lack thereof, would necessitate a choice-of-law analysis limited to this issue."  *Sigler*,

2022 WL 4000390, at *4 n.3.  Rather, the Court observed, "[T]his case involves the more

fundamental question of whether Sigler's lawsuit can proceed on any of her claims based

on timeliness."  *Id.*   By contrast here, there is no overriding, fundamental conflict that

affects all of Hernandez's claims.  Instead, the Court must first identify any substantive

differences between the laws of California and Minnesota on an issue-by-issue basis

relevant to Hernandez's claims.

**b.     Strict Liability, Negligence, and Negligent Misrepresentation**

**(1)     Whether a Conflict Exists**

Under both Minnesota and California law, the prima facie elements of a strict liability claim for failure to warn are similar, *compare Bilotta v. Kelley Co., Inc*., 346 N.W.2d 616, 623 (Minn. 1984), *with Anderson v. Owens-Corning Fiberglas Corp*., 810 P.2d 549, 559 (Cal. 1991), as are the basic elements for a strict liability claim based on design defect. *Compare Drager by Gutzman v. Aluminum Indus. Corp*., 495 N.W.2d 879, 882 (Minn. Ct. App. 1993), *review denied* (Minn. Apr. 20, 1993)), *with Demara v. The Raymond Corp*., 221 Cal. Rptr. 3d 102, 110–11 (Cal. Ct. App. 2017). The elements for negligence claims likewise consist of the same basic elements of duty, breach, causation, and damages. *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 489 F. Supp. 2d 932, 937–38 (D. Minn. 2007) (*comparing Funchess v. Cecil Newman Corp*., 632 N.W.2d 666, 672 (Minn. 2001), *with Artiglio v. Corning Inc.*, 957 P.2d 1313, 1318 (Cal. 1998)).

As to a claim for negligent misrepresentation, however, the two states' laws present an outcome-determinative conflict. Minnesota courts have neither adopted nor rejected the tort of negligent misrepresentation involving the risk of physical harm, *Smith v. Brutger Cos.*, 569 N.W.2d 408, 414 (Minn. 1997), while California courts recognize such a cause of action. *See, e.g., Scott v. C.R. Bard, Inc.*, 180 Cal. Rptr. 3d 479, 491 (Cal. Ct. App. 2014).

As Ecolab notes, the two states' laws also conflict regarding standards of comparative fault. On a fundamental level, Minnesota and California both apply principles of comparative fault to strict liability and negligence claims.[6] *See Omnetics, Inc. v. Radiant Tech. Corp.*, 440 N.W.2d 177 (Minn. Ct. App. 1989) (applying comparative fault principles to action against manufacturer of heater in which one of the theories of recovery was strict liability); *Li v. Yellow Cab Co.*, 532 P.2d 1226, 1243–44 (Cal. 1975) (adopting pure negligence principles in negligence actions); *Daly v. General Motors Corp.*, 144 Cal. Rptr. 380, 390 (Cal. 1978) (holding pure comparative fault principles apply to both strict products liability and negligence actions). However, Minnesota applies principles of modified comparative fault that diminish a plaintiff's recovery in proportion to the plaintiff's own fault, and ultimately preclude recovery where the plaintiff's fault is found to be greater than the defendant's. Minn. Stat. § 604.01, subd. 1. In comparison, under California's pure comparative fault standard, a plaintiff may obtain proportional damages, albeit diminished, even if the plaintiff is 99% at fault. *Daly*, 144 Cal. Rptr. at 390.

Depending on the evidence at trial, the application of comparative fault could lead to quite different results here, and as to negligent misrepresentation, Hernandez's claim would be foreclosed under current Minnesota law, but not under California law.[7] The

---

[6] In general, principles of comparative fault do not apply to intentional torts. *Florenzano v. Olson*, 387 N.W.2d 168 (Minn. 1986); *Thomas v. Duggins Constr. Co., Inc.*, 44 Cal. Rptr. 3d 66, 69–71 (Cal. Ct. App. 2006).

[7] In *Forslund v. Stryker Corp.*, No. 09-cv-2134 (JRT/JJK), 2010 WL 3905854, at *6 (D. Minn. Sept. 30, 2010), the court acknowledged *Smith*, 569 N.W.2d at 411, and stated that "if medical bills constituted pecuniary loss in [in negligent misrepresentation claims involving allegations of physical harm], the Minnesota Supreme Court would have

Court therefore finds these issues present an outcome-determinative conflict as to Plaintiff's strict liability, negligence, and negligent misrepresentation claims. Accordingly, the Court will apply the remaining two steps in Minnesota's choice-of-law analysis.[8]

### (2) Whether Each State's Law May Be Constitutionally Applied

As to the second step of Minnesota's choice-of-law analysis, the Court finds that each state's law may be constitutionally applied to the facts of this case. *Blake Marine*, 929 F.3d at 595. Both Minnesota and California have "significant contacts or significant aggregation of contacts" to create state interests, "such that the choice of [either state's]

---

recognized negligent-misrepresentation claims involving allegations of physical harm. The court has not done so, however, and has instead limited the scope of a negligent misrepresentation claim to a commercial or business setting with consequent pecuniary loss."

[8] *See DeRemer v. Pac. Intermountain Exp. Co.*, 353 N.W.2d 694 (Minn. Ct. App. 1984) (applying choice-of-law analysis to conflict between Minnesota's comparative negligence law and South Dakota's contributory negligence law); *Schwartz v. Consol. Freightways Corp. of Del.*, 221 N.W.2d 665 (Minn. 1974) (finding conflict between Minnesota's comparative negligence law and Indiana's contributory negligence law necessitating choice-of-law analysis); *see also Matoga v. Christopher*, No. 08-cv-2404 (DSD/JJG), 2010 WL 4450545, at *1 (D. Minn. Nov. 1, 2010) (finding difference between New Mexico's pure negligence standard and Minnesota's modified standard presented an outcome-determinative conflict); *Gerling Am. Ins. Co. v. Continental Cement Co., LLC*, No. 2:07CV00018MLM, 2009 WL 3247441, at *6–7 (E. D. Mo. Oct. 5, 2009) (finding conflict between Missouri's pure comparative fault standard and Texas' modified comparative fault standard that required choice-of-law analysis); *but see In re Guidant Corp*, 489 F. Supp. 2d at 937–38 (finding, under California's choice-of-law analysis that focuses on "governmental interest," a false conflict between California's pure comparative negligence rule and Minnesota's modified comparative negligence rule because application of Minnesota's comparative fault law in Minnesota forum would not significantly advance or impair Minnesota's interests).

law [would be] neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981).

### (3)   Leflar's Choice-Influencing Factors

Next, the Court turns to the third step in the choice-of-law analysis—the application of Leflar's five choice-influencing factors.  The factors are:  (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.  *Blake Marine*, 829 F.3d at 96.  Courts only address the fifth factor when the other four factors are not determinative.  *Schmelzle v. ALZA Corp.*, 561 F. Supp. 2d 1046, 1050 (D. Minn. 2008).

### (a)   Predictability of Results

Predictability of results "addresses whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action."  *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 7 (Minn. Ct. App. 2003) (emphasis omitted).  This factor "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping."  *Nodak*, 604 N.W.2d at 94. Predictability of results is primarily relevant in breach of contract cases, where the parties may wish to know in advance the state law that will govern any potential disputes.  *Id.* (citing *Myers v. Gov't Emps. Ins. Co.*, 225 N.W.2d 238, 242 (Minn. 1974)).  Thus, while consideration of this factor in contract cases "preserve[s] the parties' justified contractual obligations," *id.*, "[t]ort actions generally do not implicate party expectations because torts stem from unplanned accidents."  *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148,

150 (Minn. Ct. App. 1994). As the Eighth Circuit has explained, "Parties do not commit torts in one state rather than another because of that state's tort laws." *Kenna v. So-Fro Fabrics, Inc.*, 18 F.3d 623, 626 (8th Cir. 1994).

Accordingly, as in *Sigler*, 2022 WL 4000390, at *8, the Court finds that this factor does not favor the application of one state's law over the other's law as to comparative fault principles. Hernandez, a California resident working in California at the time of her alleged injuries, could have reasonably expected California's comparative fault standards would apply to any resulting tort claims, just as Ecolab could have reasonably expected Minnesota law would apply. *Id*. (citations omitted). Similarly, as to the negligent misrepresentation claim involving physical harm, Hernandez could have reasonably expected the availability of such a claim under California law, while Ecolab could have reasonably expected no liability for such claims under Minnesota law.

### (b) Maintenance of Interstate Order

When considering maintenance of interstate order, "the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." *Jepson v. Gen. Cas. Co. of Wisc.*, 513 N.W.2d 467, 471 (Minn. 1994). The Minnesota Supreme Court has stated that "maintenance of interstate order is generally satisfied as long as the state whose laws are purportedly in conflict has sufficient contacts with and interest in the facts and issues being litigated." *Myers*, 225 N.W.2d at 244. If a state has such contacts and interest, "th[is] factor is generally not implicated." *Hughes v. Wal-Mart Stores, Inc*., 250 F.3d 618, 620–21 (8th Cir. 2001) (citing *Myers*, 225 N.W.2d at 242). However, if a state "has little or no contact with a case and nearly all of

the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute." *Id*. (citation omitted) (cleaned up).

In addition, "maintenance of interstate [] order is only minimally implicated where torts are involved." *Kenna*, 18 F.3d at 626 ("[I]t cannot be said that harmonious relations between states will be advanced by applying Minnesota rather than North Dakota law, or vice versa."). This factor may be relevant in tort suits if there is evidence of forum shopping or one of the states has only a remote connection to the claim. *Blake Marine*, 829 F.3d at 595–96.

In *Sigler*, 2022 WL 4000390, at *8–11, the Court found that this factor favored the application of Oregon law over Minnesota law, as the plaintiff's employer had purchased OxyCide in Oregon, Sigler was an Oregon resident, Sigler used OxyCide in Oregon, and her alleged injury occurred in Oregon. *See also Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 965 (D. Minn. 2020) (finding that applying Minnesota's consumer protection law would demonstrate disrespect for other states' regulatory schemes where the plaintiffs' alleged physical and economic injuries occurred in the states in which the plaintiffs resided or had purchased the ATVs, even though the defendant manufacturer was based in Minnesota and had designed, manufactured, tested, and received complaints about its ATV vehicle in Minnesota); *Gruenwald v. Toro Co.*, No. 19-cv-2294 (PAM/BRT), 2019 WL 6524894, at *3 (D. Minn. Dec. 4, 2019) (finding this factor favored application of law of North Carolina, where plaintiff bought the allegedly defective lawnmower, used it, and where it caught fire, rather than Minnesota, where defendant was headquartered and the lawnmower was designed); *Hughes*, 250 F.3d at 621 (applying Leflar factors under

Arkansas law and finding state law of plaintiff's domicile, Louisiana, applied over state law of defendant's corporate headquarters, Arkansas, because Louisiana had "significant, if not all, contacts with the facts relevant to the litigation," as it was where the plaintiff purchased, used, and sustained an injury from the allegedly defective product); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003) (holding that maintenance of interstate order favored the application of the law of the state of plaintiff's domicile, as the drug in question was prescribed and ingested there, and the alleged injury occurred there).

Likewise here, to the extent this factor is implicated, it favors the application of California law to Plaintiff's strict liability and negligence-based claims, as California has the most significant contacts with the facts relevant to these claims. Again, Hernandez is a California resident, she used OxyCide in California, and her alleged injuries occurred in California.

### (c)     Simplification of the Judicial Task

Simplification of the judicial task is either immaterial or, at most, a neutral factor here, as the Court could apply the laws of either Minnesota or California without difficulty. *See Sigler*, 2022 WL 4000390, at *12 (finding this factor either immaterial or neutral); *Hughes*, 250 F.3d at 620 (finding this factor irrelevant, since "[a] federal district court is faced almost daily with the task of applying some state's law other than that of the forum state, and it is equally capable of resolving the dispute under [the laws of the competing states]."); *Danielson*, 670 N.W.2d at 8 (concluding that simplification of the judicial task was a neutral factor that "d[id] not favor any of the forums" because the competing statutes of limitations were "quite clear and easy to apply.")

**(d)    Advancement    of    the    Forum's Governmental Interest**

With respect to the fourth Leflar factor, advancement of the forum's governmental interest, courts must "determine which state's law to apply based on 'the relative policy interests of the two states.'" *Blake Marine*, 829 F.3d at 596; *see also Schwartz*, 221 N.W.2d at 668 (noting that this factor contemplates consideration of the policy interests relevant to a state's choice of law and the factual contacts with the forum). Courts in Minnesota attempt to avoid "apply[ing] a rule of law that is inconsistent with the interests and concepts of fairness and equity of Minnesota," which "has a strong interest in fully compensating victims." *Matoga*, 2010 WL 4450545, at *2 (citing *Nodak*, 604 N.W.2d at 95; *Danielson*, 670 N.W.2d at 8; *Bigelow v. Halloran*, 313 N.W.2d 10, 12–13 (Minn. 1981)). California has declared a similar policy interest. *See, e.g., Bartel v. Tokyo Elec. Power Co., Inc.*, 371 F. Supp. 3d 776, 792 (S.D. Cal. 2019) ("The primary purpose behind California's strict products liability law is to guarantee that the costs of injuries resulting from defective products are borne by manufacturers, not victims."). California's pure negligence law offers a better prospect of fully compensating victims, as does its recognition of a negligent misrepresentation claim involving physical harm. In these respects, California law better advances the forum's interest.

On the other hand, "Minnesota also has an interest in protecting defendants, as evidenced by the adoption of the Minnesota legislature of a form of comparative negligence that bars recovery by a party found to be more at fault." *Matoga*, 2010 WL 4450545, at *2 (citing Minn. Stat. § 604.01(1)). All things being equal, however, this factor "generally

weighs in favor of application of the state law in which the plaintiff lives and in which the injury occurred." *In re Baycol Prods. Litig.*, 218 F.R.D. at 207; *see also Matoga*, 2022 WL 4450545, at *2 (finding law of the state where accident occurred, New Mexico, had a stronger governmental interest than Minnesota).  Minnesota courts have followed this approach in resolving conflicts of law between Minnesota's comparative fault law and other states' less victim-friendly contributory negligence laws. *See, e.g., Schwartz*, 221 N.W.2d at 668 (finding the advancement of Minnesota's governmental interest in fair recovery for victims outweighed Indiana's where accident in Indiana involved a Minnesota truckdriver employed by a Minnesota employer, who was driving a vehicle licensed and maintained in Minnesota, on a route that originated and was expected to terminate in Minnesota); *DeRemer*, 353 N.W.2d at 697–98 (reaching same result as to Minnesota plaintiffs injured in a car accident in South Dakota).

As to negligent misrepresentation, the Restatement (Second) of Torts distinguishes between claims for negligent misrepresentation involving the risk of physical harm, § 311, and negligent misrepresentation involving pecuniary harm, § 552, that arise primarily in a business setting.  While the Minnesota Supreme Court has not foreclosed the possibility of recognizing a negligent misrepresentation claim involving the risk of physical harm, it declined to do so in *Smith*, relying, in part, upon the Restatement's distinction between the two types of claims.  569 N.W.2d at 414.  The Minnesota Supreme Court did not provide policy reasons for its decision.  The Court finds that because negligent misrepresentation involving the risk of physical harm sounds in tort, Minnesota's interest in compensating tort victims is best served by applying California law.

Moreover, while Minnesota's interest in compensating tort victims has been extended to non-residents, *see, e.g.*, *Gimmestad v. Gimmestad*, 451 N.W.2d 662 (Minn. Ct. App. 1990), the Eighth Circuit has explained that "a state's 'interest in protecting nonresidents from tortious acts committed within the state . . . is only slight and does not support application of its law to the litigation.'" *Blake Marine*, 829 F.3d at 596 (quoting *Hughes*, 250 F.3d at 621). By contrast, "'[c]ompensation of an injured plaintiff is primarily a concern of the state in which [the] plaintiff is domiciled.'" *Id.* (quoting *Kenna*, 18 F.3d at 627); *see also In re Baycol Prods. Litig.*, 218 F.R.D. at 207 ("The Eighth Circuit . . . has not given the [domicile] of the corporate defendant much weight in tort cases.") Because compensation of an injured plaintiff is of primary interest to the state of the plaintiff's residence, Minnesota's interest is not particularly served by applying Minnesota law to a non-resident who was allegedly injured in another state. Accordingly, this factor favors California law.

### (e)    Better Law

Minnesota courts place little, if any, emphasis on this factor, and only when the other factors are inconclusive. *Nodak*, 604 N.W.2d at 96; *Danielson*, 670 N.W.2d at 9. That is not the case here.

Weighing all of the relevant Leflar factors, governmental interest favors the application of California law, and predictability of results, to the extent relevant, slightly favors California law. The other factors favor neither state's law. Accordingly, California law should apply to Hernandez's strict liability, negligence, and negligent misrepresentation claims.

c.       **Breach of Implied Warranty and Express Warranty**

Although there are minor differences between Minnesota and California warranty law, the elements are essentially the same under the laws of both states. Both Minnesota and California recognize two basic causes of action for breach of implied warranty: that of merchantability and that of fitness for a particular purpose. Minn. Stat. §§ 336.2-314–336.2-315 (2023); Cal. Com. Code §§ 2314–2315 (Deering 2023). The elements of a claim for breach of express warranty are likewise similar. Minn. Stat. § 336.2–313; *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982); Cal. Com. Code § 2313, subd. 1(a)-(b); *Weinstat v. Dentsply Int'l, Inc.*, 103 Cal. Rptr. 3d 614, 626 (Cal. Ct. App. 2010).

However, as a general matter, the two states' laws differ with respect to privity of contract between the plaintiff-buyer/plaintiff-user and the defendant-seller. By statute, Minnesota has eliminated any requirement of privity. Minn. Stat. § 336.2-318 (2023) ("A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty."); *see also SCM Corp. v. Deltak Corp.*, 702 F. Supp. 1428, 1432 (D. Minn. 1988) ("[P]rivity of contract is not a prerequisite for recovery in an action for breach of warranty."). Therefore, Hernandez's precise relationship to Ecolab has no bearing on her implied warranty claims under Minnesota law.

By contrast, California generally requires privity of contract for a plaintiff to prevail on a breach of warranty claim. *Jones v. ConocoPhillips Co.*, 130 Cal. Rptr. 3d 571, 581 (Cal. Ct. App. 2011). While this would appear to present a conflict with Minnesota law,

there are exceptions to the privity requirement under California law for employees harmed by a defendant's products purchased by their employer.  *Id*. at 582 (ruling that plaintiff could make an implied warranty claim against the manufacturer of hazardous chemicals, despite the absence of privity, because it was foreseeable that plaintiff's employer was purchasing defendant's products for use by its employees); *see also Peterson v. Lamb Rubber Co*., 353 P.2d 575, 581 (Cal. 1960) (holding that employees may "stand in the shoes of the employer" and be considered "in privity to the vendor-manufacturer with respect to the implied warranties of fitness for use and of merchantable quality").  Hernandez's situation appears to fall under this exception.  Without ruling on any issues of foreseeability, and only for purposes of the choice-of-law exception, a factfinder could find it foreseeable that Pomona Hospital purchased OxyCide for use by its employees.  Thus, under these facts, a false conflict exists as to the effect of privity, because Hernandez may stand in the shoes of her employer.  Accordingly, there is no outcome-determinative conflict based on privity.

However, under Minnesota law, principles of comparative fault apply to warranty claims for which a plaintiff seeks consequential damages, such as the personal injury damages that Hernandez seeks here.  Minn. Stat. § 604.01, subd. 1a (defining the term "fault" as "acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability" and such acts or omissions "include[] breach of warranty".); *Peterson*, 318 N.W.2d at 53 (stating that "comparative fault should . . . be a defense to consequential damages in breach of warranty actions."); *see also Zutz v. Case Corp*., 422 F.3d 764, 776 n.3 (8th Cir. 2005)

(citing *Peterson*, 318 N.W.2d at 53, 54, for proposition that "[i]n breach of warranty actions in Minnesota, comparative fault is a defense to consequential damages, but comparative fault does not apply to general and incidental damages.").

California law is less clear, but based on differences between the two states' comparative fault laws, discussed earlier, if breach of warranty claims involving personal injury are subject to principles of comparative fault, a conflict with Minnesota law exists in light of California's pure comparative fault standard.  On the other hand, if such claims are not subject to comparative fault principles under California law, then a conflict also exists, as Minnesota applies modified comparative fault principles to such claims.  This presents an outcome-determinative conflict.

The same choice-of-law analysis for Plaintiff's strict liability and negligence-based claims, discussed earlier, applies to her breach of warranty claims, given that Hernandez seeks breach-of-warranty damages for her personal injuries that are essentially grounded in tort law.  Therefore, for the reasons discussed earlier, California law also applies to Hernandez's breach of warranty and breach of implied warranty claims.

### d.    Misrepresentation and Fraudulent Concealment

As to Hernandez's claims for intentional misrepresentation and fraudulent concealment, under both Minnesota and California law, these two claims are variations on the same theme.  *Compare U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011), *with Engalla v. Permanente Medical Grp., Inc.*, 938 P.2d 903, 917 (Cal. 1997).  While pecuniary damages are often identified as an element of fraudulent misrepresentation under Minnesota law, *U.S. Bank*, 802 N.W.2d at 373, in contrast to

California law, *Engalla*, 938 P.2d at 917, "it is clear under Minnesota law that fraud claims may also be based on fraudulently-induced personal injuries." *R.A.P. v. B.J.P.*, 428 N.W.2d 103, 108–09 (Minn. Ct. App. 1988).

Ecolab argues that Hernandez's intentional misrepresentation and fraudulent concealment claims fail because she identifies no evidence showing that a corporate officer, or any Ecolab employee, communicated with her. (Defs.' Summ. J. Mem. at 36–37.) Ecolab additionally challenges Hernandez's reliance on any alleged misrepresentations. (*Id*. at 36; Defs.' Summ. J. Reply at 14–16.) However, neither of these defenses results in an outcome-determinative conflict of law. *See Vikse v. Flaby*, 316 N.W.2d 276, 284 (Minn. 1982); *Varwig v. Anderson-Behel Porsche/Audi, Inc.*, 141 Cal. Rptr. 539, 540 (Cal. Ct. App. 1977); *Engalla*, 938 P.2d at 917, 919; *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 320–21 (Minn. 2007).

In sum, the elements of intentional misrepresentation and fraudulent concealment, and the proof required to establish them, largely mimic one another under California and Minnesota law. As such, applying either state's law would not be outcome-determinative. *Nodak*, 604 N.W.2d at 94. Accordingly, the Court will apply Minnesota law to these claims, as it is the law of the forum.

Having resolved the questions regarding choice of law, the Court proceeds to address Ecolab's arguments in support of summary judgment. As noted earlier, Ecolab contends that Hernandez cannot establish causation for any of her claims and that her claims for breach of warranty, intentional misrepresentation, and fraudulent concealment also fail as a matter of law. (Defs.' Summ. J. Mem. at 22–38.)

### 2.      Causation

As one of its grounds for summary judgment, Ecolab argues that Hernandez has failed to present a question of fact that her injuries were caused by her exposure to OxyCide.  (*Id.* at 22.)  Many of Ecolab's summary judgment arguments on causation replicate its *Daubert* arguments.

Causation is an element that Plaintiff must establish for all of her claims.  *See, e.g.*, *Pannu v. Land Rover N. Am., Inc.*, 120 Cal. Rptr. 3d 605, 615 (Cal. Ct. App. 2011) ("A manufacturer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product."); *Garman v. Magic Chef, Inc.*, 173 Cal. Rptr. 20, 22 (Cal. Ct. App. 1981) ("Causation is a necessary element in strict liability just as it is in negligence liability."); *Pisano v. Am. Leasing*, 194 Cal. Rptr. 77, 80 (Cal. Ct. App. 1983) (holding that causation is a required element in a claim for breach of express or implied warranty); *U.S. Bank*, 802 N.W.2d at 373 (listing causation as an element of intentional misrepresentation claim).

Under California law, in the products liability context, proof of causation requires the plaintiff to establish both general and specific causation to a "reasonable medical probability based upon competent expert testimony" that the product in question was capable of causing the injury alleged, and that the product caused or was a substantial factor in causing the plaintiff's injury.  *Rutherford v. Owens–Illinois, Inc.*, 941 P.2d 1203, 1219 n.11 (Cal. 1997); *Jones*, 209 Cal. Rptr. at 460; *see also Lugrain v. EKO N. Am., Inc.*, No. 2:20-cv-10249-SK, 2022 WL 16888547, at *4 (C.D. Cal. Oct. 21, 2022) (noting that *Rutherford*'s "substantial factor" test applied in products liability case involving plaintiff

alleging injury from defendant-manufacturer's trash can).  This requires tort plaintiffs "to show not merely that [the product] increased the likelihood of injury, but that it more likely than not caused their injuries."  *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1320 (9th Cir. 1995 (citing *Jones*, 209 Cal. Rptr. at 460–62), *on remand from Daubert*, 113 S. Ct. at 2799.  The California Supreme Court has recognized that causation is typically a question of fact, but when the facts fail to support a finding of causation, "the question is one of law, not of fact."  *State Dep't of State Hosps. v. Sup. Ct.*, 349 P.3d 1013, 1022 (Cal. 2015).

Ecolab argues that Dr. Harrison fails to offer his causation opinion to a reasonable degree of medical certainty sufficient to support causation.  (Defs.' Summ. J. Mem.  at 25–26.)  However, Dr. Harrison's Supplemental Report remedies this omission.  (Harrison Suppl. Report at 13.)  For example, as to general causation, Dr. Harrison opines "to a reasonable degree of medical certainty" that "the medical and scientific literature shows that OxyCide is a sensitizing asthmagen and exposure to its vapors can cause both new onset occupational asthma and work-aggravated asthma."  (Harrison Suppl. Report at 12.)  As to specific causation, he opines "to a reasonable degree of medical certainty" that Hernandez likely inhaled OxyCide into her lungs and that her "work-aggravated asthma" was likely caused by her exposure to OxyCide.  (*Id*. at 12–13.)

### a.      Quantification of the Exposure

Ecolab argues that because Dr. Harrison did not measure Hernandez's level of exposure, and, in particular, failed to conduct a dose-response assessment, Plaintiff cannot establish causation as a matter of law.  (Defs.' Summ. J. Mem. at 25; Defs. Summ. J. Reply at 12.)  Ecolab also maintains that the basis for his opinion is unsupported, again arguing

that Dr. Harrison's opinion that PAA is not subject to a dosage requirement is dependent upon PAA being classified as a respiratory sensitizer. (Defs.' Summ. J. Mem. at 26–28.) However, Ecolab asserts that no scientific literature supports such a classification, including the Association of Occupational and Environmental Clinics ("AOEC"), which does not consider PAA a respiratory sensitizer or an asthmagen, contrary to Dr. Harrison's deposition testimony in *Slamer*. (*Id*. at 26) (citing Harrison *Slamer* Dep. at 37:3-:17).

Just as the Court declined to exclude Dr. Harrison's testimony on this basis under *Daubert*, it likewise denies summary judgment on this basis here.[9]  Dr. Harrison opines that continued exposure to OxyCide can aggravate preexisting conditions as well as trigger the onset of respiratory sensitivity, "even in relatively small quantities." (Harrison Report at 11–12.)  In his Supplemental Report, Dr. Harrison states that "[t]he medical literature

---

[9] When addressing Defendant's Motion to Exclude, the Court applied Eighth Circuit law and found, for purposes of admissibility under *Daubert*, that Hernandez met the threshold showing that she was exposed to toxic levels of OxyCide known to cause the type of injuries she has suffered.  S*upra* at II.A.2.d (citing *Mattis*, 295 F.3d at 86).

Ultimately, at trial, Hernandez must establish causation for her non-intentional tort claims under California law, as California law applies to these claims.  Under *Rutherford*, 941 P.2d at 1223, a products liability case involving asbestos-related latent injuries, the court found that a plaintiff must establish some threshold exposure to the product, and further establish, in reasonable medical probability, that the particular exposure or series of exposures was a substantial factor in bringing about the injury.  This standard has been applied beyond asbestos-related cases.  *See, e.g., Green v. Axiall Corp.*, No. SS027333, 2021 Cal. Super. LEXIS 97970, at *13 (Cal. Sup. Ct. Jan. 12, 2021) (relying on *Rutherford* in a case involving injury allegedly arising from exposure to dry-cleaning chemicals, and stating, "A plaintiff may prove causation in a personal injury action involving products liability by demonstrating, to a reasonable medical probability, that plaintiff's exposure to a defendant's product was a substantial factor in contributing to the aggregate dose of exposure, and hence to the risk of developing the medical condition at issue.").

indicates OxyCide is a sensitizing asthmagen and exposure to its vapors can cause both new onset occupational asthma and work-aggravated asthma." (Harrison Suppl. Report at 3.) At trial in *Slamer*, Dr. Harrison clarified that both the AOEC's materials and its website identify "OxyCide," comprised of a mixture of PAA and hydrogen peroxide, as a respiratory sensitizer and asthmagen. (Vercoski Summ. J. Decl., Ex. 42 (Feb. 22, 2023 *Slamer* Trial Tr.) at 31:3-:21.) As discussed earlier, Dr. Harrison testified in *Slamer* about why the dose-response relationship is inapplicable to cases such as this due to the sensitizing effect of PAA, (*id*. at 28:21-31:3-:21), and among the 10,000 patients whom Dr. Harrison has diagnosed and treated are healthcare workers who have developed occupational asthma after using as OxyCide. (Harrison Report at 2.)

The court finds that a genuine dispute of material fact on causation precludes summary judgment based on the levels of exposure. Again, Ecolab will be free to cross examine Dr. Harrison and present its own evidence on this issue.

### b. Medical Conditions and Differential Diagnosis

Likewise, for the reasons discussed earlier in the context of Ecolab's Motion to Exclude, the Court declines to enter summary judgment as a matter of law based on Dr. Harrison's alleged failure to conduct a differential diagnosis in order to rule out other conditions and exposures as the cause of Hernandez's injuries.

"Under the applicable substantial factor test, it is not necessary for a plaintiff to establish . . . the proximate cause of injury with absolute certainty *so as to exclude every other possible cause of a plaintiff's illness*, even if the expert's opinion was reached by performance of a differential diagnosis." *Cooper v. Takeda Pharms. Am., Inc*., 191 Cal.

Rptr. 3d 67, 85 (Cal. Ct. App. 2015).   In *Cooper*, the appellate court found that the trial court erred in striking the specific causation testimony of the plaintiff's expert testimony and granting judgment notwithstanding the verdict.   The expert had conducted his differential diagnosis by reviewing the plaintiff's medical records, the relevant literature, and his own scientific research.   *Id*.   Ruling out other possible causes and risk factors, he ultimately concluded that the defendant's drug was the "most substantial causative factor." *Id*.   The appellate court found that the trial court improperly held the expert to a more stringent causation standard than is required in civil cases.   *Id*.   Instead of requiring the plaintiff to rule out every other possible cause of the injury, the appellate court stated,

> The jury here was required to determine whether there was any substantial evidence that other known risk factors for bladder cancer acted on plaintiff and provided an alternative explanation for his disease.   But only if the existence of an alternative explanation, supported by substantial evidence and not mere speculation, as a matter of law *defeated* the explanation proffered by Cooper [] would [judgment notwithstanding the verdict] be appropriate.

*Id*. at 85–86.

The record reflects Dr. Harrison's recognition that Hernandez has other medical conditions and social habits.   His opinions can support a finding that he considered and eliminated other possible causes of Plaintiff's injuries.   Under *Cooper*, 191 Cal. Rptr. 3d at 85–86, he was not required to definitively rule out every other possible cause of Hernandez's injuries in order to opine that her exposure to OxyCide was the cause or a substantial cause of her injuries.   Ecolab will have the opportunity to depose Dr. Harrison on this subject, to cross examine him at trial, and to present the testimony of its own experts, some of whom point to Hernandez's other medical conditions as causes of her injuries.

Given these disputed issues of fact, the record does not support summary judgment on causation. Accordingly, the Court denies Ecolab's motion in this regard.

### 3. Warranty Claims

For several reasons, Ecolab argues that it is entitled to summary judgment on Hernandez's breach of warranty claims. First, as a procedural matter, Ecolab argues that summary judgment is appropriate because in *Slamer*, the plaintiff agreed to dismiss her express and implied warranty claims against Ecolab. (Defs.' Summ. J. Mem. at 31.) Ecolab asserts that because Hernandez makes the same warranty-based claims here, predicated upon the same allegations, and subject to the same discovery, it "would be appropriate to dismiss these claims now." (*Id*.) The Court declines to do so. The facts of these cases are different. As Hernandez notes, in *Slamer*, the plaintiff was exposed to OxyCide as a bystander, whereas Hernandez, an EVS worker, underwent training on the use of OxyCide, reviewed Ecolab's training materials and the SDS, and worked directly with OxyCide. (Hernandez Dep. at 137:8-:17, 140:14-:19, 209:19-210:8.)

Substantively, Ecolab contends that summary judgment is appropriate because no affirmation or promise supports Plaintiff's express warranty claim. (Defs.' Summ. J. Mem. at 32–34.) As to the claim for breach of implied warranty, Ecolab asserts that Hernandez cannot establish that OxyCide is not of merchantable quality or that it is not safe or fit for its intended use in cleaning hospitals. (*Id*. at 34.)

California law provides causes of action for a seller's breach of either express or implied warranties. *Jones*, 130 Cal. Rptr. 3d at 581. Express warranties must be formed by the seller, but implied warranties attach by default to every sale of goods. Cal. Com.

Code §§ 2313–2315.  As applicable here, for either type of warranty, to prevail, the plaintiff must establish that:  (1) there was a sale of goods; (2) the defendant seller made an express or implied warranty for the goods; (3) there was a breach of warranty; and (4) the breach caused harm to the plaintiff.  *Scott v. Metabolife Int'l, Inc.*, 9 Cal. Rptr. 3d 242, 250 (Cal. Ct. App. 2004).

### a.      Express Warranty

In a sale of goods, an express warranty may be formed either by the seller's affirmation of fact or promise relating to the goods, or by a description of the goods.  Cal. Com. Code § 2313.  California courts apply a three-step analysis to express warranty claims to determine:  (1) whether the defendant seller's statements constitute such an affirmation, promise, or description of the goods; (2) whether the seller's statement was "part of the basis for the bargain"; and (3) whether the goods were nonconforming so as to breach the warranty.  *Keith v. Buchanan*, 220 Cal. Rptr. 392, 395 (Cal. Ct. App. 1985) (citations and internal quotation marks omitted).

Ecolab moves for summary judgment based on the first element.  However, Plaintiff contends that Ecolab's statements in the OxyCide SDS constitute a fact, promise, or description of the goods.  (Pl.'s Summ. J. Opp'n at 32.)  As a user of the product, Hernandez asserts that Ecolab directly communicated to her and that she reviewed the SDS.  (*Id*.)  In response, Ecolab argues that statements in the SDS do not constitute an affirmation, and moreover, Hernandez did not read the entire SDS and could not remember the parts that she read.   (Defs.' Summ. J. Reply at 12–13.)  Also, Ecolab contends that the SDS specifically disclaimed that it served as a warranty, as it stated, "The information given is

designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification." (May 2019 SDS at 12.)

Where there is no evidence of an affirmation of fact, promise, or description of the goods, an express warranty claim fails as a matter of law. *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1034 (E.D. Cal. 2013). Under California law, to constitute the required affirmation, promise, or description sufficient to support a claim for breach of express warranty, a seller's statement need not be formal: language on packaging, instructions, or marketing material may suffice. *Hauter v. Zogarts*, 534 P.2d 377, 379, 384–85 (Cal. 1975) (finding language on product's box and in instruction booklet stating, "Completely Safe Ball Will Not Hit Player," constituted an affirmation creating an actionable express warranty); *see also Keith*, 220 Cal. Rptr. at 397 (holding that a sailboat seller's description of the vessel in a brochure as "well-equipped and very seaworthy" was an affirmation of fact creating an express warranty). But a seller's affirmation must be sufficiently specific and unequivocal, therefore, "[v]ague statements regarding reliability, safety, and fitness for use which say nothing about the specific characteristics or components of the product at issue are not actionable express warranties." *Frenzel v. Aliphcom*, 76 F. Supp. 3d 999, 1018 (N.D. Cal. 2014) (citation and internal quotation marks omitted).

Although it is a close question, the Court finds that questions of fact exist as to whether Ecolab made an affirmation of fact or provided a description that could constitute an express warranty as to product safety. For example, Ecolab's statements in the SDS that

PPE is "not normally required" for the use of diluted OxyCide and that there are "no known or expected symptoms" resulting from such use, are sufficiently specific affirmations of fact or descriptions of the goods so as to survive summary judgment.

These statements can be construed to address the specific characteristics of OxyCide and are more specific than general statements about safety or quality. Appearing on an official document rather than a sailboat sales brochure or toy instructions, the SDS language is both more formal and more explicit than the affirmations of safety found sufficient by the *Keith* and *Hauter* courts. By contrast, in *Diamondstar Entertainment Holdings, LLC v. THH, LLC*, __ F. Supp. 3d __, 2022 WL 16951838, at *16 (C.D. Cal. Nov. 15, 2022), the court found, following a bench trial, that the plaintiff's breach of express warranty claim failed, as the plaintiff had not shown or explained the specific oral or written statement that constituted the alleged warranty. The court found that the only facts relevant to the express warranty claim—the manufacturer's SDS statement that its disinfectant wipes were "safe," and the manufacturer's statement during contract negotiations that the wipes were "good"—were not sufficiently specific to constitute either an express warranty or a product specification or description. In contrast, the OxyCide SDS specifies the chemical composition of the product. (May 2019 SDS at 2, 5.) It further provides detailed instructions for use, handling, disposal, first aid, clean-up, and fire-fighting. (*Id*. at 3–4.) But most relevant here, the SDS identifies permissible levels of exposure as well as potential health effects and symptoms associated with human exposure. (*Id*. at 5–8.) Accordingly, there is a dispute of material fact as to whether Ecolab made an affirmation, promise, or description sufficient to create an express warranty.

56

Ecolab also argues that even if the SDS is an affirmation of fact, promise or description of the goods, Hernandez did not read the entire SDS and could not remember the portions that she reviewed, such as the disclaimer. (Defs.' Summ. J. Reply at 12–13.) This argument implicates reliance. Under California law, plaintiffs are not required to have read to a high degree of specificity all of the details of the affirmation, promise or description of the goods. In a putative class action, *Weinstat v. Dentsply International, Inc.*, 103 Cal. Rptr. 3d 614, 625–29 (Cal. Ct. App. 2010), the court considered a manufacturer's argument that statements in its dental devices' directions, which were sealed in the products' packages, did not go to the basis of the bargain, and thus, could not form an express warranty. The court rejected the manufacturer's argument, stating, "Dentsply reasons that because the Directions were not available until delivery and the 'purchase decision had already been made,' appellants cannot prove that they saw and read the statements prior to the purchase and thus their breach of express warranties claims are doomed. Not so." *Id*. at 627. The court held that under California's UCC, a plaintiff need not prove reliance on specific promises made by the seller, citing official comments to § 2313, which state that "[i]n actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof." *Id*. at 626 (citing § 2313, comment 3.)

In *Karim v. Hewlett-Packard Company*, 311 F.R.D. 568, 574–75 (N.D. Cal. 2015), a putative class action involving a breach of express warranty claim based on a computer

manufacturer's statements on its website, the court discussed *Weinstat*.  It stated that "[w]hile *Weinstat* does indeed make clear that plaintiff must show 'exposure' to the challenged statement," such exposure "does not require that the buyers must prove that they actually <u>read</u> the statement; instead, under *Weinstat*, it is sufficient for plaintiff to show that the statement was made available to them."  *Id*.  The *Karim* court therefore held that the putative class was properly limited to purchasers during the time period when the relevant language was on the website.  *Id*. at 575.  The facts here show that the SDS was more than merely available to Hernandez—she reviewed portions of the it and recalled the salient need for caution when using the product, demonstrating her general familiarity with the safety-related statements in the SDS.  (Hernandez Dep. at 210:8.)  Accordingly, the Court finds that Ecolab is not entitled to summary judgment on Plaintiff's express warranty claim simply because Hernandez did not review the SDS in its entirety and cannot recall with specificity the portions that she reviewed.

As to the disclaimer, the final paragraph in the May 2019 SDS cautions that the document "is not to be considered a warranty or quality specification."  (May 2019 SDS at 12.)  However, under California law, once the seller makes a suitable affirmation, additional language purporting to modify or disclaim the warranty will not necessarily defeat a claim.  *Fundin v. Chi. Pneumatic Tool Co.*, 199 Cal. Rptr. 789, 794–95 (Cal. Ct. App. 1984); Cal. Com. Code § 2316.  In *Fundin*, the defendant manufacturer of well-drilling rigs distributed sales brochures providing the product's technical specifications, such as the hole depth and diameter the drill rig could achieve.  199 Cal. Rptr. at 794.  The brochure included a disclaimer: "The only warranty applicable is our standard written warranty.  We make no

other warranty count expressed or implied and particularly make no warranty of suitability for any particular purpose." *Id.* The court found the disclaimer ineffective, reasoning that a seller cannot warrant that its product conforms with listed specifications while simultaneously disclaiming those same specifications in the same document. *Id.* at 795; *see also* Cal. Com. Code § 2316, cmt. 1 ("This section…seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty.").

In addition, the effectiveness of a warranty's disclaimer may depend upon the relationship between the parties. *AB Avnet EMG v. Sierra Semiconductor Corp.*, No. C-93-0087, 1993 U.S. Dist. LEXIS 21608, at *14 (N.D. Cal. July 9, 1993), *aff'd*, No. 94-15420, 1996 U.S. App. LEXIS 20675 (9th Cir. Mar. 22, 1996). The defendant in *AB Avnet* manufactured computer hardware and sold it to the plaintiff distributor. *Id.* at *1. The court ruled that the specifications on the manufacturer's data sheets did not constitute an express warranty because they included a disclaimer reading in part, "[Defendant] makes no warranty, express, statutory, implied, or by description regarding the information set forth herein…." *Id.* at *11. The court distinguished its enforcement of the disclaimer from *Fundin*, 199 Cal. Rptr. at 794–95, on the grounds that in *AB Avnet*, the plaintiff was a distributor, while the *Fundin* plaintiff was an end-user. *AB Avnet*, 1993 U.S. Dist. LEXIS 21608, at *14. Two businesses, the court reasoned, are better positioned to bargain over the desired risk allocation than a consumer and a manufacturer are, so the *AB Avnet* plaintiff was subject to the disclaimer. *Id.*

Ecolab relies on *AB Avnet* in support of its disclaimer argument; however, the facts here are distinguishable by the *AB Avnet* court's own reasoning, noted above. Unlike the plaintiff in *AB Avnet*, but like the plaintiff in *Fundin*, Hernandez is an end-user who was unable to bargain for the terms of the warranty. Just as the *Fundin* manufacturer-defendant specified its drill rig's characteristics, Ecolab specified toxicological information and potential health effects in the OxyCide SDS. Because the *Fundin* court rejected the defendant's attempt to assert specifications in one breath while disclaiming them in the next, Ecolab's disclaimer may also be ineffective, assuming the SDS is found to constitute an affirmation of fact or description of the goods. The Court finds that material issues of disputed fact exist as to whether Ecolab's disclaimer negates any affirmations that may create an express warranty.

Accordingly, for all of these reasons, the Court finds that Ecolab is not entitled to summary judgment on Hernandez's claim for breach of express warranty.

### b.   Implied Warranty

A defendant's liability for an implied warranty is not dependent upon any affirmations or promises, as implied warranties of merchantability and fitness for a particular purpose attach to every sale of goods. Cal. Com. Code §§ 2314–2315; *see also Hauter*, 534 P.2d at 385. Merchantability and fitness warranties overlap substantially: Merchantability requires, *inter alia*, that the goods be "fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c). The implied warranty of fitness for a particular purpose, meanwhile, guarantees the transferred goods will be "fit for such purpose" when the seller "has reason to know any particular purpose for which

the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Id*. § 2315.

Ecolab first argues that Hernandez did not plead a claim for breach of implied warranty of fitness for a particular purpose; therefore, any arguments regarding such a claim are irrelevant. (Defs.' Summ. J. Reply at 13.)  The Court disagrees.  In her Complaint, Hernandez refers both to the "merchantable quality" of goods and whether OxyCide was "safe or fit for its intended use."  (Compl. ¶¶ 144, 148.)   In any event, here, the particular purpose for which Hernandez's employer intended to use OxyCide is the same as the product's ordinary purpose:  cleaning hospitals to prevent *C. diff.* infections.  The implied warranty claim hinges, then, on whether the product was fit for hospital disinfection. Ecolab argues that it is entitled to summary judgment on this claim because Hernandez has failed to provide any evidence showing that OxyCide is not fit for the purpose of eliminating viruses that cause widespread infections in hospitals.  (Defs.' Summ. J. Reply at 13.)

A product's fitness for its ordinary purpose, and thus its merchantability, is inextricably linked to its safety for the user.  *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rprt. 3d 695, 700 (Cal. Ct. App. 2007).  The plaintiff in *Isip* sued a defendant carmaker for breach of implied warranty when her car emitted noises, smoke, and offensive smells while running. *Id.* at 696.[10]   The defendant's requested jury instruction stated that the implied

---

[10] The *Isip* plaintiff's claims were brought under California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790–1795.7, which, like the Commercial Code, provides for an implied warranty of merchantability.  65 Cal. Rptr. 3d at 697.

warranty of merchantability "can be breached only if…the vehicle [is] . . . unfit for its ordinary purpose of providing transportation." *Id.* at 697. On appeal, the court affirmed the trial judge's rejection of that instruction in favor of language defining a product as "fit for its ordinary purpose if it is 'in safe condition and substantially free from defects.'" *Id.* at 698. The court held that to find a vehicle unfit for its ordinary purpose only if it fails to provide basic transportation, no matter how unpleasant or unsafe, is an "unjustified dilution of the implied warranty of merchantability." *Id.* at 700.

As noted, Ecolab argues that there is no evidence of "OxyCide not being fit for the purposes of eliminating viruses." (Defs.' Summ. J. Reply Mem. at 13.) If Ecolab means to argue that there is no evidence that OxyCide is unsafe for those who use it, then it simply reiterates its material dispute about the underlying facts. If, instead, Ecolab means to assert that OxyCide may be fit for its cleaning purposes regardless of its safety, so long as it effectively kills viruses, *Isip* contradicts this argument. Though the product in *Isip* was a car, both vehicles and cleaning products can serve their respective ordinary purposes— transport and disinfection—with varying degrees of safety for the user. Safety, not just transport, was essential to merchantability of the car in *Isip*; here, too, OxyCide's safety affects its merchantability, even if its virus-killing capabilities are excellent.

As to evidence in the record to support an implied warranty claim of fitness for a particular purpose, Hernandez points to the SDS and the safety representations therein as well as evidence showing that Ecolab did not conduct tests to determine applicable exposure levels for PAA. (Vercoski Summ. J. Decl., Ex. 10 (Pechacek Dep.) at 43:5-:11; *Id.*, Ex. 11 (Aug. 18, 2011 Mem.).) Hernandez also notes that by the time she viewed the

SDS in 2019, Ecolab continued to represent "no symptoms known or expected" for diluted use, despite having received customer inquiries about safety. (*Id.*, Ex. 16 (Ecolab May 17, 2017 OxyCide Safety Document Summary) at 1 (noting that Ecolab had "received a number of questions from customers concerned about employee safety.").)

In sum, the Court finds that genuine disputes of material fact preclude summary judgment on Plaintiff's implied warranty claim. Therefore, the Court denies Ecolab's motion in this regard.

### 4. Intentional Misrepresentation/Fraudulent Concealment

Ecolab argues that Hernandez's fraudulent concealment and intentional misrepresentation claims fail because no corporate officer, or any Ecolab employee, communicated any statements to her, that any statements caused her injuries, or that she relied on any such statements. (Defs.' Summ. J. Mem. at 36–37.)

California law subsumes fraudulent concealment within the framework of intentional misrepresentation: "The elements of fraud that will give rise to a tort action for deceit are: '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Engalla*, 938 P.2d at 917 (quoting *Lazar v. Sup. Ct.*, 909 P.2d 981, 984–85 (Cal. 1996); *see also id.* ("[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.") (quoting *Yellow Creek Logging Corp. v. Dare*, 30 Cal. Rptr. 629, 632 (Cal. Dist. Ct. App. 1963)).

As to Ecolab's argument that none of its employees or officers communicated with Hernandez, a plaintiff is not required to show that the defendant made a misrepresentation directly to the plaintiff, as long as the plaintiff can show he or she acted in justifiable reliance on it. *See Varwig*, 141 Cal. Rptr. at 540 (noting that a defendant making a fraudulent misrepresentation is subject to liability even where the misrepresentation is not made directly to the plaintiff, but "'to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct.'" (quoting Rest.2d Torts, § 533).  In other words, a defendant may be held liable for its misrepresentation even where a third-party intermediary passes along the message.

As noted, Ecolab also argues there is no evidence of Hernandez's reliance on any alleged misrepresentations.  (Defs.' Summ. J. Mem. at 36; Defs.' Summ. J. Reply at 14–16.)  While a plaintiff must demonstrate both actual and reasonable reliance to establish intentional misrepresentation, *Engalla*, 938 P.2d at 917, 919, providing sufficient evidence of actual reliance to survive summary judgment in not an onerous burden.  In the absence of evidence conclusively rebutting reliance, a presumption of reliance arises when the misrepresentation is material to a plaintiff's course of action.  *Id*.  A plaintiff's reliance on the truth of an intentional misrepresentation need not "be the sole or even the predominant or decisive factor in influencing [her] conduct. . . .  It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing [her] decision." *Id*. (quoting Rest.2d Torts, § 546, com. b, p. 103). The reasonableness of a plaintiff's reliance is ordinarily a question fact for the jury.  *Manderville v. PCG&S Grp., Inc.*, 55

Cal. Rptr. 3d 59, 68–69 (Cal. Ct. App. 2007). The record here contains evidence from which a jury could find that Hernandez relied on Ecolab's statements and the statements played a substantial factor in Hernandez's decision to use OxyCide.

Because fact questions exist as to whether Ecolab intentionally misrepresented the information in the OxyCide SDS, wall card, and preparation materials regarding the safety of using diluted OxyCide without PPE, and whether Hernandez actually and reasonably relied on any such misrepresentations, the Court denies summary judgment on Plaintiff's claims for intentional misrepresentation and fraudulent concealment.

In sum, the Court finds that genuine issues of material fact preclude summary judgment on all of Plaintiff's remaining claims.[11] Hernandez has "adduced enough admissible evidence to create a genuine issue of material fact as to whether [OxyCide] caused [her] injuries." *Daubert*, 43 F.3d at 1315.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

---

[11] As discussed earlier, summary judgment is granted as to her claim for strict liability based on manufacturing defect (Count II), which she does not oppose.

1.    Defendants' Motion to Exclude the Testimony of Dr. Robert Harrison [Doc. No. 27] is **DENIED**.

2.    Defendants' Motion for Summary Judgment [Doc. No. 43] is **GRANTED IN PART** as to **Count II,** and **DENIED IN PART** as to all other claims.

3.    Count II of the Complaint (strict liability based on manufacturing defect) is **DISMISSED WITH PREJUDICE.**


Dated: June 13, 2023                              s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge